## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **DR. PAUL HALCZENKO,**<br>**JENNIFER JIMENEZ,**<br>**ERIN NICOLE GILLESPIE,**<br>**VALERIE FRALIC, and**<br>**KRISTIN EVANS, on behalf of**<br>**Themselves and all those**<br>**similarly situated,**<br><br>       **Plaintiffs,**<br><br>   **vs.**<br><br>**ASCENSION HEALTH, INC., and**<br>**ST. VINCENT HOSPITAL AND**<br>**HEALTH CARE CENTER, INC.,**<br>**D/B/A ASCENSION ST. VINCENT**<br>**HOSPITAL,**<br><br>      **Defendants.** | **Cause No**. 1:21-cv-2816<br><br><br>**JURY TRIAL REQUESTED** |

## CLASS ACTION COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

*"Title VII does not contemplate asking employees to sacrifice their jobs to observe their religious practices."*

    ***Adeyeye v. Heartland Sweeteners, LLC***, 721 F.3d 444, 456 (7th Cir. 2013)

### <u>INTRODUCTION</u>

1.    This is a class action brought to remedy a pattern of discrimination by Ascension Health, Inc. ("Ascension") against employees who requested religious accommodations from Ascension's mandate that its employees receive the COVID-

19 vaccine and **to seek a temporary restraining order (TRO) and preliminary and permanent injunctive relief before Plaintiffs are suspended without pay on November 12, 2021, and then terminated on January 4, 2022**.

2.      Rather than complying with its obligations under Title VII of the Civil Rights Act of 1964, (Pub. L. 88-352), codified at 42 U.S.C. § 2000e *et seq.* ("Title VII"), Ascension informed the requesting employees that their requests for exemptions were denied, that they will be suspended without pay on November 12, 2021, and they will be considered to have "voluntarily resigned" (*i.e.*, they will be terminated) on January 4, 2022.

3.      In every case, Ascension's sole explanation for its denial of religious exemptions was a single sentence emailed to each requester:

> Due to the nature of your role, approving this accommodation poses undue hardship to the organization *due to increased risk to the workplace and patient safety*.[1]

4.      Ascension's actions have left Plaintiffs with the impossible choice of either taking the COVID-19 vaccine, at the expense of their religious beliefs or losing their livelihoods. In doing so, Ascension has violated Title VII by failing to

---

[1] *See, e.g.*, 10.1.2021 Email from **Service Desk** <ascensionprod@service-now.com to PHALCZEN@ascension.org, Subject: The Religious Exemption for COVID-19 Vaccine request is denied for Halczenko, Paul W. (**App. 20**) (Indiana). (Plaintiffs' Exhibits referenced in this Complaint are submitted in the contemporaneously filed Appendix and cited to herein as (**App. #**). *See also* Picchiottino Decl. ¶ 36, (**App. 81**) (Wisconsin); Brezillac Aff. ¶ 36, (**App. 77**) (Oklahoma); "Catholic Hospital Rejects 650 Workers' Religious Exemptions from the COVID Vaccine Mandate," *Christianity Daily* (Oct. 13, 2021) (**App. 23**) (reflecting Michigan associates were given the same justification for denials of their exemptions as associates in Indiana, Oklahoma and Wisconsin).

provide reasonable accommodations, and by refusing to follow federal law in assessing religious exemptions to its vaccine mandate.

5.     As explained below, the robotic explanation given by Ascension to applicants for religious exemption and the failure to consider reasonable accommodations or to properly assess and establish "undue hardship" as required by Title VII, require immediate intervention by this Court to prevent irreparable harm to Plaintiffs and the class they represent.

## BRIEF OVERVIEW OF PLAINTFFS' KEY CLAIMS AND CONTENTIONS

6.     The named Plaintiffs are five healthcare heroes, a doctor, a nurse practitioner, and three registered nurses, who served their patients bravely, risking their lives throughout the early phase of the COVID-19 pandemic when little was known about the SARS-CoV-2 virus.

7.     Plaintiffs now face imminent termination from their jobs based solely upon their sincerely held religious beliefs which compel them to resist forced vaccination. Ironically, the very religious faith that undergirded their resolve to risk their lives, if necessary, for their patients will be the reason that – without court intervention – Ascension will strip their employment, sever them from their life's work, and remove their income in just a few days' time.

8.     The development of the COVID-19 vaccines was a groundbreaking scientific, medical, and logistical wonder. It is therefore a tragic irony that one of the groundbreaking scientific breakthroughs of all time is being mistakenly relied upon by Ascension – one of the nation's largest healthcare employers – to justify a

sweeping disregard of long-standing statutory commands regarding how employers are to balance health and safety concerns with the rights of their employees.

9.      Simply, under Title VII if an employee seeks a religious accommodation American employers cannot summarily impose employer-preferred workplace rules which abridge an employee's sincerely held religious beliefs without genuine and good-faith dialogue and consideration of proposed accommodations and objective evidence.

10.     Here, Ascension has upended Title VII's requirements and seeks to capitalize on the COVID-19 vaccines' existence as justification to run rough-shod over its legal obligations and summarily suspend without pay, and ultimately terminate, scores of employees.

11.     The paucity of evidence and reasoning Ascension has offered to justify trammeling its employees' religious rights is appalling. Ascension, like many healthcare employers, hailed its employees as "healthcare heroes"[2] throughout the early pandemic period because they risked their lives to fill a critical need; yet overnight they became expendable without Ascension providing them any explanation, data or metrics that could justify such an about-face.

12.     Ascension's one-sentence justification that granting religious objections to the COVID-19 vaccines would create "increased risk to the workplace and patient safety" is pretextual, unsupported by Plaintiffs' experiences, and is believed to be

---

[2] *See*, *e.g.*, Ascension TV commercial entitled, "Healthcare Heroes," *available at:* https://www.ispot.tv/ad/nAo4/ascension-health-healthcare-heroes; Ascension produced video describing its employees as "Healthcare Heroes." *available at:* https://healthcare.ascension.org/blog/2020/04/COVID-1919-healthcare-heroes.

inconsistent with Ascension's own experience and whatever data it may have from its healthcare facilities over the course of the pandemic (which Ascension has unfortunately not shared with its employees).

13.     But, even more fundamentally, the idea that employees seeking religious accommodation may be terminated merely upon a claim of "increased risk" is flawed as a matter of law.

14.     Title VII does not permit an employer to deny a requested accommodation because of "increased risk." Rather, under Title VII the employer's burden is to show "undue hardship"—and merely "increased" does not without more equal "undue." *See, e.g., Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013) ("Title VII requires proof . . .of hardship, and 'undue' hardship at that."); *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978) ("Undue hardship means something greater than hardship.").[3]

15.     Thus, merely incanting the abstract notion of "increased risk" is not equivalent to showing "undue" hardship and is therefore insufficient to satisfy Ascension's statutory responsibility to identify undue hardship.

16.     Ascension's reliance on "increased risk" is an attempt to import a wholly new legal standard, not countenanced by any statute, rule, regulation or case, to justify summarily discharging employees seeking religious exemptions.

17.     To the contrary, the law sensibly imposes a qualitative/quantitative, evidence-based standard. *See, e.g., Nottelson v. Smith Steel Workers D.A.L.U. 19806,*

---

[3] To be clear, Plaintiffs do not concede they pose any increased risk whatsoever.

*AFL-CIO*, 643 F.2d 445, 452 (7th Cir. 1981) (rejecting "conjectural" undue hardship claim); *Brown v. Gen. Motors Corp.*, 601 F.2d 956, 961 (8th Cir. 1979) (speculation not sufficient to discharge burden to prove undue hardship); *Anderson*, 589 F.2d at 402 ("Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts."); *Drazewski v. Waukegan Dev. Ctr.*, 651 F. Supp. 754, 758 (N.D. Ill. 1986) (speculation does not meet undue hardship standard).

18.   Furthermore, Ascension's own policies, practices, experience, publicly available government data, and other available information demonstrate that Ascension likely cannot even meet the exceedingly low (and unlawful) bar—that is the low bar of establishing increased risk—it has attempted to set for itself.

19.   Moreover, numerous inconsistencies suggest that Ascension's reliance on alleged "increased risk" is pretextual and is not the true reason for its' wholesale denial of religious exemptions.

20.   *First*, Ascension's own written policies are inconsistent with its claim. Those policies state that if an individual receives a religious or medical exemption, Ascension "follow[s] [its] normal accommodations process and *the exempted associate [is] able to care for patients but . . . need[s] to wear required personal protective equipment (PPE) at all times while on Ascension property*." [4]

21.   If Ascension had evidence that unvaccinated individuals increased risk to patients sufficiently to satisfy the undue hardship standard it would not

---

[4] *See* Questions and Answers about Ascension's Associate COVID--19 Vaccination Policy ((Ascension Vaccination Policy Q&A"), at 5 (added August 12, 2021) (**App. 12**).

maintain a written policy permitting unvaccinated employees to continue to engage in patient care.

22.     *Second*, in practice Ascension has approved medical exemptions from its vaccine mandate and allowed unvaccinated employees with medical exemptions to continue to provide patient care.[5]

23.     Ascension's illogical position must therefore be that those giving a secular (*e.g.*, medical) reason for not being vaccinated can provide patient care but it is too risky for individuals with a religious reason to provide such care.

24.     *Third*, Ascension has a twenty (20) month track record of dealing with the COVID-19 pandemic in its healthcare facilities and is believed to lack any data-driven, evidentiary basis for claiming that religious objectors who do not take the vaccines will materially increase workplace risks.

25.     Ascension has never sought to support its vaccination mandate through any examples of healthcare worker-to-patient transmission of the virus at Ascension - St. Vincent Hospital in Indianapolis or elsewhere.

26.     Plaintiffs report, based on their own extensive experience, that there have not been significant healthcare worker-to-patient transmissions of the SARS-CoV-2 virus within Ascension healthcare facilities since Ascension healthcare employees began employing rigorous *mitigation measures* (such as temperature monitoring, health assessments, masking and other measures) to prevent workplace transmission of the virus.

---

[5] Halczenko Aff. ¶ 76, (**App. 1**) (Indiana); Jimenez Aff. ¶ 73, (**App. 2**) (Indiana); Picchiottino Decl. ¶ 48, (**App. 81**) (Wisconsin); Brezillac Aff. ¶ 48, (**App. 77**) (Oklahoma).

27.     According to widely available scientific research these *mitigation measures are what keep Ascension patients safe* from transmission of the virus in Ascension facilities and are what have kept patients and healthcare workers safe since the outbreak of the pandemic.[6]

28.     *Mitigation measures* are a proven, effective, scientific, strategy that can ensure the protection of Ascension patients going forward.

29.     *Fourth*, information from the U.S. Food & Drug Administration ("U.S. FDA") is inconsistent with Ascension's one-sentence justification.

30.     Except on this one point, Ascension, relies on the U.S. FDA's guidance regarding the COVID-19 vaccines, frequently citing to FDA information about the vaccines on Ascension's website.

31.     The U.S. FDA acknowledges that while it was hoped that the COVID-19 vaccines would reduce or prevent the *transmission* of the virus, "the scientific

---

[6] *See* collection of scientific studies cited in CMS Interim Final Rule (cited in the Federal Register at 86 Fed. Reg. 61,570 (Nov. 5, 2021)) submitted in Plaintiff's Appendix as Exhibits 63 to 71 (**App. 63 – 71**) "Hospital-Acquired SARS CoV-2 Infection: Lessons for Public Health," Aaron Richterman, M.D. *et al*, 324 JAMA, 2155–56 (2020) (**App. 64**) *available at*: https://jamanetwork.com/journals/jama/fullarticle/2773128; *see also* "Hospital-acquired COVID-19 tends to be picked up from other patients, not from healthcare workers," *Science Daily*, (Aug. 24, 2021) (**App. 74**) *available at*: https://www.sciencedaily.com/releases/2021/08/210824083504.htm; "Study Shows Low Risk of COVID-19 Transmission in Hospital Among Patients Undergoing Surgery," New York-Presbyterian Newsroom (Feb. 24, 2021) (**App.73**) *available at*: https://www.nyp.org/news/study-shows-low-risk-of-covid-19-transmission-in-hospital-among-patients-undergoing-surgery; "Could We Do Better on  Hospital Acquired COVID-19 In a Future Wave?"  David Oliver, 372 BMJ (Jan 13, 2021) (**App. 72**) *available at*: https://www.bmj.com/content/372/bmj.n70.

community does not yet know if the COVID-19 Vaccine[s] will reduce such transmission."[7]

32.     *Fifth*, U.S. Centers for Disease Control and Prevention ("CDC") Director, Dr. Rochelle Walensky, has stated as recently as October 8, 2021, about COVID-19 vaccines that, "what they cannot do any more is prevent transmission."[8]

33.     *Sixth*, many other healthcare providers with vaccination mandates have not resorted to the wholesale rejection of religious exemptions. Numerous other Indianapolis hospitals permit healthcare workers with religious exemptions to continue to provide patient care.[9]

34.     Ascension has violated Title VII by substituting an "increased risk" standard for the statutory "undue hardship" standard and has failed to adequately address Plaintiffs' requested accommodations under the undue hardship standard. Additionally, there is abundant evidence Ascension's "increased risk" justification is pretextual and a cover for religious discrimination.

---

[7] *See, e.g.*, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions*, Food and Drug Administration, *available at*: https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions  (**App. 47**)
[8] CDC Director, Dr. Rochelle Walensky, Oct. 8, 2021, *available at*: https://youtu.be/swlUv2SbmT8 .
[9] *See, e.g.*, "Franciscan Health gives employees Until Nov. 15 to get fully vaccinated," Rusell, John, *Indianapolis Business Journal* (Sept. 27, 2021) (**App. 79**); "Hospitals offer exemption for COVID-19 vaccine mandate. Many employees took it," Rudavsky, Shari, *Indianapolis Star* (Oct. 13, 2021) (**App. 80**); Rentschler Aff. ¶¶ 5-8 (App. 76) (Eskenazi Hospital Respiratory Therapist); Haerr Aff. ¶¶ 4-7 (App. 75) (Community North (Kokomo), direct patient care).

35.     Plaintiffs have recently filed their charges of discrimination with the Equal Employment Opportunity Commission (EEOC) asking that the EEOC investigate their charges on a class wide basis.

36.     Therefore, this Court should promptly enter a temporary restraining order and preliminary injunction enjoining Ascension from terminating any Ascension associate who has applied for a religious exemption to its vaccine mandate until the EEOC has had the opportunity to investigate Plaintiffs' recently filed EEOC charges.

## **THE PARTIES**

### A.     **Ascension Health Care, Inc.**

37.     Plaintiffs are employed by St. Vincent Hospital and Health Care Center, Inc. (referred to herein as "St. Vincent" "St. Vincent Hospital" or "Ascension – St. Vincent"), which does business as Ascension – St. Vincent Hospital in Indianapolis, Indiana.

38.     St. Vincent owns and/or operates healthcare facilities in Indiana, including Ascension – St. Vincent and the Peyton Manning Children's Hospital at St. Vincent ("PMCH"), both located at 2001 W 86th Street in Indianapolis, Indiana, and the Ascension – St. Vincent Women's Hospital at 8111 Township Line Road in Indianapolis, Indiana ("SVWH").[10]

39.     St. Vincent is owned by Ascension Health Care, Inc. ("Ascension") in St. Louis, Missouri.

---

[10] Unless stated otherwise, PMCH and SVWH are both intended to be included in any reference to Ascension – St. Vincent, St. Vincent Hospital, or St. Vincent.

40.     Ascension exercises ultimate direction and control over the activities of Ascension - St. Vincent Hospital and Ascension – St. Vincent Women's Hospital, including having final decision-making authority in relation to employees at both hospitals who applied for religious exemptions to the Ascension vaccine mandate described below.

41.     Ascension - St. Vincent Hospital (including PMCH and SVWH) are part of the Ascension national health care system which is controlled by Ascension corporate headquarters.

42.     By virtue of the control exercised by Ascension over Ascension - St. Vincent (including PMCH and SVWH) and their employees both Ascension and Ascension – St. Vincent are employers of Plaintiffs within the meaning of 42 U.S.C. § 2000e(b) and Plaintiffs are employees of both Ascension and Ascension – St. Vincent within the meaning of 42 U.S.C. § 2000e(f).

43.     Within the meaning of 42 U.S.C. § 2000e(b) Ascension and Ascension – St. Vincent acted as agents of each other in relation to the employment actions described in this Complaint.

44.     Ascension and Ascension - St. Vincent employ more than fifteen (15+) employees at each of the St. Vincent Hospital, PMCH and SVWH locations.

45.     Ascension, though its national healthcare system, operates more than 2,600 sites of care – including 142 hospitals and more than 40 senior living facilities – in 19 states and the District of Columbia, while providing a variety of services including clinical and network services, venture capital investing, investment

management, biomedical engineering, facilities management, risk management, and contracting through Ascension's own group purchasing organization.

https://www.ascension.org/About?intent_source=nav_footer&_ga=2.257679630.4065 85572.1634768682-256273680.1634270751.

46.     Across its system Ascension employs more than 150,000 healthcare workers whom it refers to as "associates" and 40,000 aligned providers. *Id*.

47.     Title VII applies to Ascension's healthcare workforce including all "Ascension associates" and Ascension's doctors, nurse practitioners, registered nurses, healthcare technicians and other healthcare workers who are all "employees" of Ascension within the meaning of Title VII.

48.     Ascension is required to comply with Title VII in administering its COVID-19 vaccination, medical and religious exemption processes for its employees and "associates" in its national healthcare system (including all doctors, nurses, healthcare technicians, and other healthcare workers) including Plaintiffs and the class Plaintiffs seek to represent.

**B.     The Plaintiffs and Proposed Class Representatives**

49.     **Dr. Paul Halczenko**, M.D., is a Pediatric Critical Care Physician at PMHC. Dr. Halczenko has been employed by Ascension since October 1, 2012 and is a citizen and resident of Marion County, Indiana.

50.     During the early days of the COVID-19 pandemic and continuing through the present, Dr. Halczenko admitted, stabilized, diagnosed, and treated children in end-organ failure related to primary infection with SARS-CoV-2 (the

virus responsible for COVID-19), or the uncommon but severe complication in children known as Multisystem Inflammatory Syndrome in Children following SARS-CoV-2 exposure ("MIS-C"). He continued his lifesaving work for other patients with other critical illnesses during the pandemic, including but not limited to failure of the lungs due to other viral or bacterial infections, birth defects, and defects of heart, lungs, or other organs threatening life, traumatic brain injuries or other life-threatening bleeding inside the skull, and other illnesses typical of pediatric critical illness.

51.     Dr. Halczenko will suffer irreparable harm if he is suspended without pay on November 12 and/or his employment is terminated on January 4. As explained further in his affidavit, Dr. Halczenko is obligated to make ongoing payments for tuition to send his children to Catholic school and the presence of a non-compete clause in Dr. Halczenko's employment contract with Ascension – St. Vincent will prevent him from seeking employment as a physician within the area surrounding Ascension – St. Vincent and will force him into long commutes or require him to uproot and re-locate his family. [11]

52.     Further, termination of Dr. Halczenko's employment by Ascension – St. Vincent would create troublesome issues with Dr. Halczenko's medical licensure, hospital privileges, and contracts with third-party insurance payors. As explained in his affidavit, due to unique issues related to licensing and hospital privileges, Ascension – St. Vincent's termination of his employment will operate upon Dr.

---

[11] *See* Halczenko Aff. ¶¶ 14, 16 (**App. 1**).

Halczenko like a "Scarlet Letter" and directly, immediately, and permanently impair Dr. Halczenko's ability to seek alternative employment.[12]

53.     Nurse Practitioner **Jennifer Jimenez** is an employee of Ascension and Ascension - St. Vincent Hospital in Indianapolis, Indiana where she has been continuously employed since May 21, 2012. Mrs. Jimenez began her career at St. Vincent as a Registered Nurse. She subsequently obtained her master's degree and transitioned to Nurse Practitioner on August 12, 2018. Nurse Practitioner Jimenez works as a Hospitalist with the Adult Internal Medicine Service at St. Vincent Hospital where she admits, diagnoses, treats, and performs ongoing complex medical management of adult patients. She is a citizen and resident of Hamilton County, Indiana.[13]

54.     For months during the early part of the COVID-19 pandemic in 2020 Nurse Practitioner Jimenez worked long hours diagnosing, treating, admitting, and providing ongoing care for acutely ill adult patients with the SARS-CoV-2 virus. Specifics about the care she provides are set forth in her affidavit.[14]

55.     Suspension without pay on November 12 would cause significant and irreparable harm to Nurse Practitioner Jimenez and to her family and career. The Jimenez family has two children in college and loss of Ms. Jimenez's income would require at least one child to discontinue college. If Ms. Jimenez is terminated the Jimenez family will likely lose their home. Additionally, like Dr. Halczenko, Nurse

---

[12] *Id.* at ¶ 17.
[13] *See* Jimenez Aff. ¶¶ 4, 17(**App. 2**).
[14] *Id.* ¶ 18

Practitioner Jimenez would experience extreme and stressful licensure and insurance difficulties if suspended without pay or terminated. She also has a non-compete in her St. Vincent contract. The impacts on Ms. Jimenez if terminated are described more fully in her affidavit.[15]

56.     Nurse **Erin Nicole Gillespie** is an employee of Ascension and St. Vincent at SVWH in Indianapolis, Indiana. Nurse Gillespie has been employed by St. Vincent since May 2007. Nurse Gillespie is a citizen and resident of Boone County, Indiana. Nurse Gillespie works in the High-Risk OB/Labor and Delivery Unit at St. Vincent Women's Hospital where she provides specialized nursing care to women experiencing pregnancies ranging from uncomplicated to high risk/medically complex during the antepartum, intrapartum, and postpartum periods in a Level IV rated obstetrical unit.[16]

57.     For months during the early part of the COVID-19 pandemic in 2020 Nurse Gillespie worked long hours providing patient care while pregnant herself and then with a newborn and another young child at home. While much was still unknown about the virus, it's transmissibility, and the availability/accuracy of patient testing, she continued to provide patient care despite the potential risks to herself and her family. Early on, she provided care to patients without knowing if they were COVID-19 positive or not. More about Nurse Gillespie's care of patients is set forth in her affidavit.[17]

---

[15] *Id*. at 8–16.
[16] *See* Gillespie Aff. ¶¶ 4, 10 (**App. 4**).
[17] *Id*. ¶ 11.

58.     Nurse Gillespie will suffer irreparable harm if she is suspended without pay on November 12. As explained in her affidavit, Nurse Gillespie's salary helps to provide for the essential needs of her family. She and her husband have two young children, one who is currently in preschool requiring tuition payments. Mortgage payments, utility bills, and groceries to feed the Gillespie family cannot wait for monetary damages to possibly be awarded at an unknown date in the future. [18]

59.     Nurse **Valerie Fralic** is an employee of Ascension and St. Vincent and works at PMCH in Indianapolis, Indiana where she has been employed since 2019. Nurse Fralic is a citizen and resident of Putnam County, Indiana.[19]

60.     For months during the early part of the COVID-19 pandemic in 2020, Nurse Fralic worked long hours providing patient care to children in end-organ failure related to primary infection with SARS-CoV-2. She comforted and cried with parents who lost a child to the complications associated with COVID-19. She helped admit and stabilize many children suffering from the uncommon but severe MIS-C complication. She also continued caring for acutely ill children, including but not limited to children with respiratory, cardiac, and neurological diagnosis. On countless occasions Nurse Fralic was called upon to leave the unit she was trained on to help in adult COVID-19 units that were understaffed during a time when

---

[18] *Id.* at ¶ 9.
[19] *See* Fralic Aff. ¶ 4 (**App. 7**).

little was known about SARS-CoV-2. She willingly did this because of her love for her patients and her commitment to the wellbeing of others.[20]

61.     On November 5, 2021, Nurse Fralic was named Employee of the Month for the month of November for the Pediatric Intensive Care Unit (PICU) at PMCH.[21]

62.     Nurse Fralic devotes much of her non-work time to a Christian non-profit boy's home where her husband is employed. Nurse Fralic is the primary wage earner in their family and her income is used not just for Nurse Fralic and her husband, but to care for many young men in the boy's home program. Suspension without pay and/or termination of her job by Ascension - St. Vincent would have a significant impact on the Fralic's participation in the boy's home ministry and the support they can give to the youth they mentor. [22]

63.     Nurse **Kristin Evans** is an employee of Ascension and  St. Vincent at the PMCH  in Indianapolis, Indiana where she has been employed since November 2015. Nurse Evans is a citizen and resident of Hendricks County.[23]

64.     Nurse Evans is a registered nurse in the PICU at the PMCH where she cares for very sick children ages 0-17 years. Nurse Evans is part of the extracorporeal membrane oxygenation (ECMO) team and cares for ECMO patients in the ICU.  ECMO is used in critical care situations to allow blood to bypass the heart and lungs to permit these organs to rest and heal. Nurse Evans also serves as

---

[20] *Id*. at ¶ 13.
[21] Fralic Supplemental Declaration ¶ 3 (**App. 8**).
[22] *Id*. at ¶ 9.
[23] *See* Evans Aff. ¶ 4 (**App. 5**).

a charge nurse, working shifts in which she oversees her entire unit as well as the nurses working the unit. The care Nurse Evans provides to patients is more fully described in her affidavit.[24]

65.     Nurse Evans will suffer irreparable harm if she is suspended without pay on November 12. As explained in her affidavit, Nurse Evans is going through a divorce and will soon be paying her mortgage on her own while caring for her three children, including an infant. Losing her job would mean loss of health insurance for her and her children, inability to pay her mortgage and possible loss of her home, as well as inability to pay school tuition for her 13-year and 5-year-old daughters. Additionally, the severe stress caused by the potential loss of her job at Ascension – St. Vincent has caused health impacts described in her affidavit. [25]

## JURISDICTION & VENUE

66.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

67.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

68.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events complained of herein occurred in this District and Division.

## FACTUAL ALLEGATIONS

### A.     The COVID-19 Pandemic

---

[24] *Id.* at ¶ 14.
[25] *Id.* at ¶¶ 8–13.

69.     By Spring 2020, the Alpha variant of the novel coronavirus SARS-CoV-2 had spread around much of the world including in the United States.

70.     In response, Ascension began implementing mitigation procedures for its workforce, including the following requirements for its employees:

(1)     **daily personal assessments of both personal health (including temperature, symptoms, etc.) and required disclosure of any potential exposure to others with COVID-19,**

(2)     **daily onsite temperature testing,**

(3)     **periodic COVID-19 testing,**

(4)     **the obligation to not work when symptomatic or potentially exposed to COVID-19 pursuant to CDC Guidelines,**

(5)     **submission to any required contact tracing,**

(6)     **handwashing and hygiene, and**

(7)     **use of personal protective equipment (PPE), including masking, face shields, gowns, and disposable gloves as required under the circumstances.[26]**

71.     The foregoing mitigation procedures appear to have been highly effective in preventing the spread of the SARS-CoV-2 virus and its variants within Ascension facilities.

72.     Many Ascension employees, including each Plaintiff and other affiant employees of Ascension, are unaware of any cases of documented transmission of the SARS-CoV-2 virus and/or its variants from any Ascension employee to another Ascension employee or to a patient.

---

[26] *See, e.g.*, Halczenko Aff. ¶ 21, (**App. 1**).

19

73.     This is not surprising, robust research attributes prevention of

transmission of the virus in a hospital setting to mitigation procedures such as

those listed above.[27]

74.     In her affidavit Nurse Gillespie explains how these mitigation

measures work in practice to protect patients and associates when an Ascension

employee is exposed to COVID-19 outside the work environment:

> I know from personal experience that the mitigation
> measures already in use at Ascension-St. Vincent work to
> prevent the transmission of COVID-19 at Ascension – St.
> Vincent. Every day before work, I screen myself using the
> COVID-19 Self Screening tool provided by Ascension. On my
> days off, if I begin to experience symptoms, I can also use the
> screening tool then, which will initiate the testing process if
> needed. On August 26, 2021, I noticed that I had lost my sense
> of taste and smell. I immediately filled out the self-screening
> tool, which started the process for me to arrange to get tested. I
> was able to go and take a test just a couple of hours after
> noticing and reporting my symptom. I was then able to call off of
> work the next day, and quarantine for the remaining timeframe
> from onset of first symptom, which meant I missed two days of
> work during that time. Therefore, due to the current measures
> we are already using, I recognized and reported my symptoms,
> got tested, and then quarantined which prevented me from
> exposing any of my coworkers or patients. [28]

---

[27] *See* collection of scientific studies cited in CMS Interim Final Rule (cited in the Federal
Register at 86 Fed. Reg. 61,570 (Nov. 5, 2021)) submitted in Plaintiff's Appendix as
Exhibits 63 to 71 (**App. 63 – 71**) "Hospital-Acquired SARS CoV-2 Infection: Lessons for
Public Health," Aaron Richterman, M.D. *et al*, 324 JAMA, 2155–56 (2020) (**App. 64**)
*available at*: https://jamanetwork.com/journals/jama/fullarticle/2773128; *see also* "Hospital-
acquired COVID-19 tends to be picked up from other patients, not from healthcare
workers," *Science Daily*, (Aug. 24, 2021) (**App. 74**) *available at*:
https://www.sciencedaily.com/releases/2021/08/210824083504.htm; "Study Shows Low Risk
of COVID-19 Transmission in Hospital Among Patients Undergoing Surgery," New York-
Presbyterian Newsroom (Feb. 24, 2021) (**App. 73**) *available at*:
https://www.nyp.org/news/study-shows-low-risk-of-covid-19-transmission-in-hospital-
among-patients-undergoing-surgery; "Could We Do Better on Hospital Acquired COVID-19
In a Future Wave?" David Oliver, 372 BMJ (Jan 13, 2021) (**App. 72**) *available at*:
https://www.bmj.com/content/372/bmj.n70.

[28] *See* Gillespie Aff. ¶ 55 (**App. 4**).

75.     Since the early days of the pandemic, three separate COVID-19 vaccines have been developed and authorized for use in the United States. The FDA issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 11, 2020. A week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine. Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.

76.     On August 23, 2021, the FDA issued full approval for the Pfizer vaccine Comirnaty for individuals 16 years of age and older. Pfizer's EUA also remains in place.

77.     To date, the FDA has not yet issued any other approvals for either the Moderna or Johnson & Johnson vaccine.).

78.     The Pfizer, Moderna and Johnson & Johnson vaccines were all developed to address the Alpha variant, the original strain of the SARS-CoV-2 virus.

79.     On July 27, 2021, the same date that Ascension adopted its vaccine mandate, the U.S. CDC released updated guidance which included a recommendation for "everyone in areas of substantial or high transmission to wear a mask in public indoor places, even if they are fully vaccinated."[29]

80.     CDC issued this new guidance due to recent developments, including new data "that the *Delta variant was more infectious* and was leading to increased

---

[29] "Delta Variant: What We Know About the Science," *CDC website* (updated Aug. 26, 2021) ("CDC Delta Variant Resource"), *available at*: https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (**App. 45**).

transmissibility when compared with other variants, *even in some vaccinated individuals.*"[30]

81.     "As of August 28, 2021, the Delta variant of concern (B.1.617.2) [was] the predominant variant in the United States, with 99% of sequenced specimens being identified as Delta."[31]

82.     The Delta variant remains the predominant variant of SARS-CoV-2 in the U.S.[32]

83.     As of October 27, 2021, the CDC's "Nowcast" model which seeks to track recent proportions of circulating variants in the United States reported that the Delta variant comprised 99.6% of the variants recently detected throughout the U.S.[33]

84.     As of October 27, 2021, the Nowcast model found the prevalence of the original Alpha variant to be 0.0% nationally.[34]

---

[30] *Id.* (emphasis added).
[31] "Science Brief: COVID--19 Vaccines and Vaccination," *CDC website* (updated Sept. 15, 2021), *available at*: https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (hereafter "CDC Brief"). (**App. 89**).
[32] This is in line with the experience in other western countries. *See, e.g.,* "SARS-CoV-2 variants of concern and variants under investigation in England, Technical Briefing 20" Public Health England (Aug. 6, 2021), ("England Public Health Briefing") (**App. 57**) *available at*:
https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1009243/Technical_Briefing_20.pdf ("Delta variant accounted for approximately 99% of sequenced and 98% genotyped cases from 25 July to 31 July 2021").
[33] CDC COVID-19 Data Tracker, Variant Proportions, *CDC website* (for week ending Oct. 23, 2021) (**App. 46**), *available at*: https://COVID-19.cdc.gov/COVID-19-data-tracker/#variant-proportions.
[34] *Id.*

85.     The most recent CDC data tracker information for Indiana likewise reported the Delta variant predominance at over 99% and the Alpha variant at 0.03%.[35]

86.     It has been well understood since July when Ascension's vaccine mandate was announced that the Delta variant "is spreading in settings where there is high vaccine coverage[.]"[36]

87.     The high transmissibility of the Delta variant among those who have been vaccinated has been confirmed repeatedly in research studies.[37]

88.     These studies indicate that vaccinated individuals are susceptible to infection with the Delta variant and present a risk of transmitting SARS-CoV-2 to others.[38]

89.     Ascension admits that at the time its mandate was adopted Ascension had no data regarding the effectiveness of the Johnson & Johnson and Moderna vaccines against the Delta variant.[39]

---

[35] *Id.*
[36] "Vaccinated and unvaccinated individuals have similar viral loads in communities with a high prevalence of the SARS-CoV-2 delta variant," University of Wisconsin (July 31, 2021) (**App. 88**) ("University of Wisconsin Study") at 1; *available at*: https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v1.
[37] *See*, *e.g.*, Wisconsin Study at 2-3, *available at*: ; "Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021," *CDC* (Sept. 24, 2021) (**App. 50**) ("CDC Prison Study") at 1 ("During a COVID--19 outbreak involving the Delta variant in a highly vaccinated incarcerated population, transmission rates were high, even among vaccinated persons."); *available at*: https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e3.htm.
[38] University of Wisconsin Study at 2-3.
[39] *Questions and Answers about Ascension's Associate COVID--19 Vaccination Policy* (added October 4, 2021) (not publicly available, available only on the Ascension intranet) at 8. (**App. 12**).

90.     Ascension concedes "recent data has shown that there has been an increase in breakthrough infections in vaccinated individuals related to the Delta variant."[40]

91.     The researchers in a University of Wisconsin Study concluded that, "a substantial proportion of individuals with SARS-CoV-2 vaccine breakthrough infections during [their] study period ha[d] levels of SARS-CoV-2 RNA in nasal secretions . . . consistent with the ability to transmit the virus to others."[41]

92.     Studies have found that once an individual contracts the Delta variant there is "limited difference in viral load between those who are vaccinated and unvaccinated."[42]

93.     In other words, a vaccinated person may be as contagious as a non-vaccinated person once they contract the Delta variant.[43]

94.     CDC Director Dr. Rochelle Walensky has recently stated about COVID-19 vaccines that, "what they cannot do any more is prevent transmission."[44]

---

[40] *Id.*

[41] University of Wisconsin Study at 2.

[42] England Public Health Briefing at 35; *accord* University of Wisconsin Study at 2-3.

[43] *Id.*, CDC Prison Study at 3 ("During a COVID--19 outbreak in a federal prison involving the highly transmissible SARS-CoV-2 Delta variant, transmission was high among vaccinated and unvaccinated persons. . . the duration of positive serial test results was similar between these two groups, and infectious virus was cultured from both vaccinated and unvaccinated participants.").

[44] CDC Director, Dr. Rochelle Walensky, Oct. 8, 2021, *available at*: https://youtu.be/swlUv2SbmT8 .

95.    The inability of the COVID-19 vaccines to prevent the *transmissibility* of SARS-CoV-2, particularly as to highly transmissible variants of concern, was well known by late July, 2021 when Ascension adopted its vaccine mandate.[45]

96.    Research over this summer has confirmed the transmissibility of the SARS-CoV-2 virus. A study available as preprint from University of Wisconsin-Madison demonstrated "[t]esting a subset of these low-Ct samples revealed infectious SARS-CoV-2 in 15 of 17 specimens (88%) from unvaccinated individuals and 37 of 39 (95%) from vaccinated people" suggested continued risk of transmission.[46]  Additionally, on October 29, 2021, researchers from the UK National Health Institute published their findings noting that "Nonetheless, fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts."[47]

97.    As a result, there exists significant scientific consensus that because of the risk of breakthrough infections, reliance upon PPE and mitigation efforts such

---

[45] As of July 2021, there were eight SARS-CoV-2 variants considered to pose threats to human society. Among these is the Lambda variant currently spreading in Chile where the vaccination rate is "relatively high . . . suggesting that the Lambda variant is proficient in escaping from the antiviral immunity elicited by vaccination." "SARS-CoV-2 Lambda variant exhibits higher infectivity and immune resistance," Izumi Kimura *et al.*, (July 28, 2021) at 4. *Id*. (**App. 53**), *available at*: https://www.biorxiv.org/content/10.1101/2021.07.28.454085v1.

[46] "Shedding of Infectious SARS-CoV-2 Despite Vaccination," Riemersma, Kasen K., *et al.*, (Oct. 15, 2021) (**App. 59**), *available at*: https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v5.

[47] "Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK; a prospective, longitudinal, cohort study," Singanayagam, Anika *et al*., *Lancet Infect., Dis.* (Oct. 28, 2021) (**App. 54**), *available at*: https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.

as Ascension employees have practiced for nearly two years, continues to be essential for both vaccinated and unvaccinated persons.[48] These mitigation measures will need to continue to be practiced whether a hospital has a vaccination mandate or not. As scientists at the University of Wisconsin observed:

> [T]he finding of high SARS-CoV-2 viral loads in vaccinated individuals has important implications for risk assessment and mitigation. . . . Vaccinated individuals, particularly those who may have high levels of community or occupational exposure to SARS-CoV-2, should be encouraged to continue frequent testing, especially when symptomatic, to limit community spread. *Continued adherence to non-pharmaceutical interventions, such as masking and distancing, will remain important for both vaccinated and unvaccinated individuals because we cannot predict which vaccinated individuals will experience breakthrough infections with high viral loads.* This somewhat unexpected finding also underscores the uncertainty about the long-term performance of SARS-CoV-2 vaccines. While vaccines continue to provide outstanding protection against severe disease and mortality, the durability of this protection cannot be reliably predicted. Therefore, it is essential for public health policy to encourage vaccination while also planning for contingencies, including diminished long-term protection.[49]

### The Pfizer Vaccine

98.     The FDA issued an EUA for the Pfizer-BioNTech BNT162b2 ("Pfizer" or "Pfizer-BioNTech") vaccine on December 11, 2020.[50]

---

[48] *See*, *e.g.*, Wisconsin Study at 3; CDC Prison Study at 1 ("Even with high vaccination rates, maintaining multicomponent prevention strategies (e.g., testing and masking for all persons and prompt medical isolation and quarantine for incarcerated persons) remains critical to limiting SARS-CoV-2 transmission in congregate settings where physical distancing is challenging.").

[49] University of Wisconsin Study at 3 (emphasis added).

[50] "Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions," U.S. FDA website (accessed Oct. 28, 2021) ("U.S. FDA Pfizer FAQs"). (**App. 47**).

99.     Peer reviewed research linked on the Pfizer website initially reported a 95% effectiveness rate of the Pfizer–BioNTech mRNA COVID-19 vaccine BNT162b2 against the Alpha variant of the SARS-CoV-2 virus.[51]

100.    However, other researchers reported a lower effectiveness rate for the Pfizer vaccine against the Alpha variant of SARS-CoV-2, such as the 76% rate for the Pfizer shot reported January – July 2021 by the Mayo Clinic Health System.[52]

101.    A gradual decline in efficacy of the Pfizer vaccine against SARS-CoV-2 is observed over a 6-month period.[53]

102.    A study in the *Lancet* reflected a decline in the Pfizer vaccine's effectiveness against infections "from 88% (95% CI 86–89) during the first month after full vaccination to 47% (43–51) after 5 months."[54]

103.    The Pfizer vaccine is less effective against the Delta variant than against the original Alpha variant.

104.    The Mayo Clinic found only a 42% effectiveness rate for the Pfizer vaccine during July, 2021 in its Minnesota patients when the prevalence of the

---

[51] "Impact and effectiveness of mRNA BNT162b2 vaccine against SARS-CoV-2 infections and COVID--19 cases, hospitalisations, and deaths following a nationwide vaccination campaign in Israel: an observational study using national surveillance data," *The Lancet* (May 5, 2021), (**App. 55**), available at: https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00947-8/fulltext.
[52] "Comparison of two highly-effective mRNA vaccines for COVID--19 during periods of Alpha and Delta variant prevalence," *Mayo Clinic* (Aug. 8, 2021) (**App. 87**), *available at*: https://www.medrxiv.org/content/10.1101/2021.08.06.21261707v1.full.pdf
[53] "Safety and Efficacy of the BNT162b2 mRNA COVID--19 Vaccine through 6 Months," *New England Journal of Medicine* (Sept. 15, 2021) (**App. 58**) at 1; available at: https://www.nejm.org/doi/pdf/10.1056/NEJMoa2110345?listPDF=true; "Effectiveness of mRNA BNT162b2 COVID--19 vaccine up to 6 months in a large integrated health system in the USA: a retrospective cohort study," *Lancet* (Oct. 16, 2021) at 1. (**App. 86**), available at: https://www.thelancet.com/action/showPdf?pii=S0140-6736%2821%2902183-8.
[54] *Id.*

Delta variant in Minnesota had increased to over 70% and the Alpha variant prevalence had diminished to only 13% of infections.[55]

105.   Another study found a 43.3% effectiveness rate for the Pfizer vaccine in the United States in September 2021.[56]

106.   In the CDC Prison Study, the CDC researchers found that among fully vaccinated persons without a prior SARS-CoV-2 infection 85% of Pfizer-BioNTech recipients contracted the virus.[57] In other words, only 15% of those individuals vaccinated with the Pfizer vaccine did not contract COVID-19.

107.   Ascension regularly relies upon and republishes on the Ascension website FDA data and information concerning the COVID-19 vaccines.[58]

108.   The FDA reports that "[d]ata are not yet available to inform about the duration of protection that the [Pfizer] vaccine will provide."[59]

---

[55] "Comparison of two highly-effective mRNA vaccines for COVID--19 during periods of Alpha and Delta variant prevalence," *Mayo Clinic* (Aug. 8, 2021) (**App. 87**), *available at*: https://www.medrxiv.org/content/10.1101/2021.08.06.21261707v1.full.pdf.

[56] "SARS-CoV-2 vaccine protection and deaths among US veterans during 2021," Cohn, Barbara A., *et al.*, *Science* (Nov. 4, 2021) (**App. 83**, *available at*: https://www.science.org/doi/10.1126/science.abm0620.

[57] CDC Prison Study at 2.

[58] For instance, information found in Ascension's "Frequently asked questions: COVID-19 vaccination," (**App. 14**) *available at*: https://healthcare.ascension.org/COVID--19/COVID-19-vaccine) under the question: "**Is one vaccine preferred (or safer) than the other? Does it matter which one I take?**" (at p. 4) is identical in wording to information found on the FDA's webpage: U.S. FDA Janssen FAQs (**App. 82**) in response to the question on the FDA website: "**Is it possible to make comparisons about the effectiveness among the three COVID--19 vaccines that the FDA has authorized for emergency use to date?**"), *available at*: https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine-frequently-asked-questions.

[59] "Pfizer-BioNTech COVID--19 Vaccine Frequently Asked Questions," U.S. FDA website (accessed Oct. 28, 2021) ("U.S. FDA Pfizer FAQs"). (**App. 47**).

109.    According to the FDA, "It is not known if the [Pfizer] vaccine protects against asymptomatic SARS-CoV-2 infection."[60]

110.    The FDA acknowledges that there is *no current scientific evidence that the Pfizer COVID-19 vaccine will reduce transmission* of the SARS-CoV-2 virus. The FDA website reports:

> Most vaccines that protect from viral illnesses also reduce transmission of the virus that causes the disease by those who are vaccinated. While it is hoped this will be the case, *the scientific community does not yet know if the Pfizer-BioNTech COVID-19 Vaccine will reduce such transmission.*[61]

---

[60] *Id.*
[61] *Id.*

**The Moderna Vaccine**

111.    The FDA issued an EUA for the Moderna mRNA-1273 COVID-19 vaccine on December 18, 2020.[62]

112.    Moderna "vaccine efficacy against SARS-CoV-2 Delta [variant] wanes over time; [and] there are limited data on the impact of durability of immune responses on protection."[63]

113.    "Recent studies in the United Kingdom, United States, and Qatar have shown reduced efficacy of mRNA-based vaccines against asymptomatic and symptomatic, but not severe, [Delta variant] infection."[64]

114.    In the CDC Prison Study, the CDC researchers found that among fully vaccinated persons without a prior SARS-CoV-2 infection 54% of Moderna recipients contracted the virus.[65]

115.    Another study found a 58.0% effectiveness rate for the Moderna vaccine in the United States in September, 2021.[66]

---

[62] "Moderna COVID--19 Vaccine Frequently Asked Questions," *U.S. FDA website* ("U.S. FDA Moderna FAQs") (**App. 48**), *available at*: https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-COVID--19/moderna-COVID--19-vaccine-frequently-asked-questions.

[63] "Protection from SARS-CoV-2 Delta one year after mRNA-1273 vaccination in nonhuman primates is coincident with an anamnestic antibody response in the lower airway," Researchers from the National Institute of Allergy and Infectious Diseases in Bethesda, Emory University School of Medicine in Atlanta, Bioqual Inc. in Rockville, and Moderna Inc. in Cambridge (Oct. 24, 2021) ("Moderna Research Study") (**App. 56**) at 1; *available at*: https://www.biorxiv.org/content/10.1101/2021.10.23.465542v1.full.

[64] *Id.*

[65] CDC Prison Study at 2.

[66] "SARS-CoV-2 vaccine protection and deaths among US veterans during 2021," Cohn, Barbara A., *et al.*, *Science* (Nov. 4, 2021) (**App. 83**), *available at*: https://www.science.org/doi/10.1126/science.abm0620.

116.    The FDA reports that "[d]ata are not yet available to inform about the duration of protection that the [Moderna] vaccine will provide."[67]

117.    According to the FDA, "It is not known if the [Moderna] vaccine protects against asymptomatic SARS-CoV-2 infection."[68]

118.    The FDA acknowledges that there is *no current scientific evidence that the Moderna COVID-19 vaccine will reduce transmission* of the SARS-CoV-2 virus. The FDA website reports:

> Most vaccines that protect from viral illnesses also reduce transmission of the virus that causes the disease by those who are vaccinated. While it is hoped this will be the case, *the scientific community does not yet know if Moderna COVID-19 Vaccine will reduce such transmission.*[69]

### The Johnson & Johnson Vaccine

119.    The FDA issued an EUA for the Johnson & Johnson (also known as "Janssen") COVID-19 vaccine on February 27, 2021.[70]

120.    In the clinical trial upon which the FDA based its EUA for the Johnson & Johnson vaccine, "the vaccine was approximately 67% effective in preventing moderate to severe/critical COVID-19 disease occurring at least 14 days after vaccination and 66% effective in preventing moderate to severe/critical disease at least 28 days after vaccination."[71]

---

[67] *Id.*
[68] U.S. FDA Moderna FAQs.
[69] *Id.*
[70] "Janssen COVID--19 Vaccine Frequently Asked Questions," *U.S. FDA website*, ("U.S. FDA Janssen FAQs") (**App. 82**), *available at*: https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine-frequently-asked-questions,.
[71] U.S. FDA Janssen FAQs.

121.    Another study found a 13.1% effectiveness rate for the Johnson &
Johnson vaccine in the United States in September, 2021.[72]

122.    The FDA reports that "[d]ata are not yet available to inform about the
duration of protection that the [Johnson & Johnson] vaccine will provide."[73]

123.    According to the FDA, "It is not known if the [Johnson & Johnson]
vaccine protects against asymptomatic SARS-CoV-2 infection."[74]

124.    The FDA acknowledges that there is *no current scientific evidence that
the Johnson & Johnson COVID-19 vaccine will reduce transmission* of the SARS-
CoV-2 virus. The FDA website reports:

> Most vaccines that protect from viral illnesses also reduce
> transmission of the virus that causes the disease by those who
> are vaccinated. While it is hoped this will be the case, *the
> scientific community does not yet know if Janssen COVID-19
> Vaccine will reduce such transmission.*[75]

### Natural Immunity

125.    Israeli researchers in a large study[76] "in one of the most highly
COVID-19–vaccinated countries in the world, examined medical records of tens of
thousands of Israelis, charting their infections, symptoms, and hospitalizations

---

[72] "SARS-CoV-2 vaccine protection and deaths among US veterans during 2021," Cohn,
Barbara A., *et al.*, *Science* (Nov. 4, 2021) **(App. 83)**, *available at*:
https://www.science.org/doi/10.1126/science.abm0620.
[73] *Id.*
[74] U.S. FDA Janssen FAQs.
[75] *Id.*
[76] *See* "Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity:
reinfections versus breakthrough infections," *Maccabie Healthcare Services* (Aug. 25, 2021)
("Israel Study") at 3 **(App. 49)**, *available at*:
https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full-text.

between 1 June and 14 August, when the Delta variant predominated in Israel"[77] and found natural immunity stronger and longer lasting that that induced by the Pfizer vaccine. These researchers concluded:

> This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity. Individuals who were both previously infected with SARS-CoV-2 and given a single dose of the vaccine gained additional protection against the Delta variant.[78]

126.   The Israel Study found that "never-infected people who were vaccinated in January and February were, in June, July, and the first half of August, six to 13 times more likely to get infected than unvaccinated people who were previously infected with the coronavirus. In one analysis, comparing more than 32,000 people in the health system, the risk of developing symptomatic COVID-19 was 27 times higher among the vaccinated, and the risk of hospitalization eight times higher."[79]

127.   Charlotte Thålin, a physician and immunology researcher at Danderyd Hospital and the Karolinska Institute in Stockholm who studies immune responses

---

[77] "Having SARS-CoV-2 once confers much greater immunity than a vaccine—but vaccination remains vital," *Science* (Aug. 26, 2021), *available at*: https://www.science.org/content/article/having-sars-cov-2-once-confers-much-greater-immunity-vaccine-vaccination-remains-vital. (**App. 85**.

[78] Israel Study at 3.

[79] "Having SARS-CoV-2 once confers much greater immunity than a vaccine—but vaccination remains vital," Science (Aug. 26, 2021), available at: https://www.science.org/content/article/having-sars-cov-2-once-confers-much-greater-immunity-vaccine-vaccination-remains-vital. (**App. 85**).

to SARS-CoV-2, said the Israel Study is "a textbook example of how natural immunity is really better than vaccination."[80]

128.   Several Plaintiffs have recovered from the COVID-19 virus and acquired natural immunity confirmed by antibody testing. For instance, Nurse Practitioner Jimenez recovered from COVID-19 contracted in late 2020 and currently has robust natural immunity with antibody levels (measured in October 2021) exceeding 2500 U/mL, which is much higher than average antibody levels of 1084 U/mL found in fully COVID-19 vaccinated individuals who had received two doses of the vaccine but not contracted COVID-19 as found in one study.[81] Nurse Practitioner Jimenez provided a copy of her laboratory test results to Ascension in mid-October.[82]

### CMS Interim Final Rule with Comment

129.   On November 5, 2021, the Centers for Medicare & Medicaid Services (CMS) of the U.S. Department of Health & Human Services released a proposed interim final rule with comment (i.e., "IFC") it referred to as "Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination" (hereafter, the "IFC").

130.   The IFC as proposed will apply to a vast variety of "21 types of providers and suppliers, ranging from hospitals to hospices and rural health clinics

---

[80] *Id.*

[81] "Trial shows 4,500% increase in antibody levels between vaccine doses," www.medicaldevice-network.com news, (Sept. 2, 2021), (**App. 29**).

[82] Labcorp Patient Report for Jennifer Jimenez dated Oct. 11, 2021 ("Antibody Test Results") (**App. 26**)

to long term care facilities (including skilled nursing facilities and nursing facilities, collectively known as nursing homes)."[83] Many of these providers do not have in place the robust COVID-19 mitigation measures employed at Ascension facilities or require stringent compliance with masking measures, as the IFC points out.

131.   Citing several studies,[84] the IFC confirms that mitigation measures (such as masking, COVID-19 testing, etc.) are "highly effective" at preventing COVID-19 transmission in healthcare settings "when implemented correctly and consistently," stating:

> Because SARS–CoV–2, the virus that causes COVID-19–19 disease, is highly transmissible, Centers for Disease Control and Prevention (CDC) has recommended, and CMS reiterated, that health care providers and suppliers implement robust infection prevention and control practices, including source control measures, physical distancing, universal use of personal protective equipment (PPE), SARS–CoV–2 testing,

---

[83] 86 Fed. Reg. 61,556 (Nov. 5, 2021).

[84] "Incidence of Nosocomial COVID--19 in Patients Hospitalized at a Large US Academic Medical Center," Rhee, Chanu, *et al*., JAMA (**Sept 9, 2020**) (**App. 65**) ("**Findings** In this cohort study of 9149 patients admitted to a large US academic medical center over a 12-week period, 697 were diagnosed with COVID--19. In the context of a comprehensive and progressive infection control program, only 2 hospital-acquired cases were detected: 1 patient was likely infected by a presymptomatic spouse before visitor restrictions were implemented, and 1 patient developed symptoms 4 days after a 16-day hospitalization but without known exposures in the hospital. **Meaning** These findings suggest that overall risk of hospital-acquired COVID--19 was low and that rigorous infection control measures may be associated with minimized risk."), *available at*:
https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2770287; "Risk Factors Associated With SARS-CoV-2 Seropositivity Among US Health Care Personnel," Jacob, Jesse T., *et al*., JAMA (**Mar. 10, 2021**) (**App. 70**) ("**Findings**  In this cross-sectional study of 24 749 HCP in 3 US states, contact with an individual with known coronavirus disease 2019 (COVID--19) exposure outside the workplace was the strongest risk factor associated with SARS-CoV-2 seropositivity, along with living in a zip code with higher COVID--19 incidence. None of the assessed workplace factors were associated with seropositivity. **Meaning**  In this study, most risk factors associated with SARS-CoV-2 infection among HCP were outside the workplace, suggesting that current infection prevention strategies in health care are effective in preventing patient-to-HCP transmission in the workplace."), *available at*: https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2777317.

environmental controls, and patient isolation or quarantine. *Available evidence suggests these infection prevention and control practices have been highly effective when implemented correctly and consistently.*[85]

132.   However, the IFC recommends a vaccination mandate across all 21 types of CMS-regulated healthcare facilities because, according to the IFC, "[s]tudies have also shown . . . that consistent adherence to recommended infection prevention and control practices can prove challenging—and those lapses can place patients in jeopardy."[86]

133.   The IFC reports that, "[i]n outbreaks reported from acute care settings in the U.S. following implementation of universal masking, *unmasked exposures* to other health care workers *were frequently implicated*."[87]

134.   The IFC relies upon six (6) studies of COVID-19 transmission in healthcare settings to support its conclusion that consistent adherence to masking and non-vaccination mitigation measures are "challenging."[88] These six studies are

---

[85] 86 Fed. Reg. 61,557 (Nov. 5, 2021).

[86] *Id.*

[87] *Id.* (emphasis added).

[88] "Nursing home staff networks and COVID--19," Chen, M. Keith, et al., (**Dec. 28, 2020**) (**App. 71**) (Using analysis of smartphone data collected from March 13 – May 31, 2020, from nursing home workers, this study concluded that a significant cause of COVID--19 outbreaks were nursing home workers that worked at more than one facility. The study recommended workers be restricted to working at a single facility, that testing of workers be increased and "allocation of PPE, testing, and other preventive measures should be targeted thoughtfully, recognizing the current potential for transmission across homes."), *available at*: https://www.pnas.org/content/pnas/118/1/e2015455118.full.pdf; "Hospital-Acquired SARS-CoV-2 Infection Lessons for Public Health," Richterman, Aaron, *et al.*, *JAMA*. 2020;324(21):2155-2156 (**Nov. 13, 2020**) (**App. 64**) (study noting the success of masking in reducing COVID--19 transmission in healthcare settings and recommending universal eye protection during clinical encounters, COVID-19 testing and concluding "[t]hrough these measures, transmission could be further minimized (and perhaps even eliminated)");, *available at*: https://jamanetwork.com/journals/jama/fullarticle/2773128; "State-wide Genomic Epidemiology Investigations of COVID--19 Infections in Healthcare

reproduced in Plaintiffs' Appendix and briefly described and linked above in

footnote 88.

---

Workers – Insights for Future Pandemic Preparedness, Watt, Anne E., et al., (**Sept. 8, 2021**) (**App. 67**) (reporting results of genome sequencing on 765 COVID--19 cases in Victoria, Australia between March and October 2020 to identify source of healthcare worker infections with COVID--19 and identified major contributors to be mobility of staff and patients between wards and facilities and behaviors of individual patients; makes the case for more usage of genome sequencing in healthcare investigations), *available at*: https://www.medrxiv.org/content/10.1101/2021.09.08.21263057v1.full-text; "Transmission of community- and hospital-acquired SARS-CoV-2 in hospital settings in the UK: A cohort study," Mo, Yin, *et al.*, (**Oct. 12, 2021**) (**App. 66**) (study of data from 4 teaching hospitals in the UK from Jan. – Oct. 2020 concluded that exposure to another patient who had acquired the virus while in the hospital was associated with an additional 8 infections per 1000 patients while exposure to an infectious healthcare worker was associated with substantially lower infection risks of 2 per 1000 patients; the researchers noted that over the time period of the study use of PPE increased such that from June onwards there was universal masking, social distancing, isolation of exposed patients and healthcare workers, etc.; authors approved suggestion of others that "enhanced PPE for [healthcare workers] and ventilation may play a role" in limiting transmission), *available at*: https://journals.plos.org/plosmedicine/article?id=10.1371/journal.pmed.1003816; "Healthcare-associated COVID--19 in England: a national data linkage study," Bhattacharya, Alex, *et al.*, (**Feb. 19, 2021**) (**App. 63**) (study reviewed hospital admission records and national test data in England from Jan. 2, 2020 to Aug. 31, 2020; authors reported that up to 15% of COVID--19 infections from hospitalized patients probably came about from infection while in healthcare, no attempt was made to ascertain whether such infections arose from healthcare workers or other patients; authors noted that "[t]he overall effect of . . . limitations [to the study] will likely have been to over-estimate probable and definite hospital-onset case numbers," noting that this period covered a time with little preparedness for the pandemic, the authors observed that preparedness in the UK should be better due to "comprehensive guidelines for infection prevention . . . pre-admission testing of . . . patients . . . [and weekly] screen[ing] [of] staff . . . in periods of higher community prevalence"), *available at*: https://www.medrxiv.org/content/10.1101/2021.02.16.21251625v1.full-text; "Occupational COVID--19 exposures and secondary cases among healthcare personnel, Ibiebele, Jessica, *et al.*, *Am J Infect Control*. 2021 Oct; 49(10): 1334–1336 (**Aug. 8, 2021**) (**App. 69**) (study conducted from Jun. 1 – Dec. 31, 2020, primarily analyzed 1,655 cases where a healthcare worker was exposed to COVID--19 from a patient that did not wear a cloth face covering or facemask and the healthcare worker was unmasked or was masked but did not wear eye protection and was within 6 feet of the case for at least 15 minutes and cases-known as Tier 1 cases-and 311 cases where a healthcare worker was in  in contact with an aerosol-generating procedure (AGP) and did not wear an N95 respirator (or equivalent), eye protection, gown and gloves-none as Tier 2 cases; authors recommended "[m]itigation factors must include widespread testing and adherence to isolation precautions and PPE guidelines including maintaining physical distancing when masks must be removed around other employees"), *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8349432/.

135.    None of these six studies recommend vaccination as a means of reducing COVID-19 transmission in healthcare facilities, and it appears none of the research cited in the IFC presents data from a controlled study seeking to measure whether vaccination alters risk of healthcare workers transmitting the SARS-CoV2 virus in a hospital setting.

136.    Instead, all six studies recommend focusing upon diligent use of PPE and other mitigation measures, including primarily masking, and COVID-19 testing to identify asymptomatic infections for healthcare workers.[89]

137.    In terms of masking, one study relied upon in the IFC pointed to "findings [that] suggest that overall hospital transmission of SARS-CoV-2 in the setting of universal masking is likely rare, even during periods of high community prevalence."[90]

138.    This paper cited an example of "[a] detailed contact tracing study of 226 patients exposed to health care workers with confirmed COVID-19 during the surge in Boston found only 1 possible transmission, and this was in the context of a 30-minute encounter during which both patient and health care worker were unmasked." It also referenced, "a complementary analysis of the same hospital system, [where] researchers found no convincing cases of in-hospital transmission among more than 9000 admitted patients after implementation of universal masking for staff and patients."[91]

_____

[89] *See* studies at fn. 88 above.
[90] *See* Richterman, Aaron, *Hospital-Acquired SARS-CoV-2 Infection: Lessons for Public Health*, JAMA 2155 (Dec. 1, 2020) (**Ex. 64**).
[91] *Id.*

139.   The study concluded, "[w]hat is clear is that these hospital-based outbreaks have not revealed a failure of universal masking, but rather challenges in systems such as inadequate support to maintain masking adherence and basic human nature, in which individuals tire of masking. In particular, breakdowns have occurred in small workrooms and during mealtime in facilities that were not designed to allow adequate physical distancing during a respiratory pandemic."[92]

140.   All six studies analyzed data from 2020 when the Alpha variant was the primary strain of COVID-19; none discuss the more transmissible Delta variant; none suggest that use of masking, targeted use of N95 masks, appropriate hygiene and PPE, pre-work health assessments and temperature checks, along with regular COVID-19 testing (all regular practices at Ascension facilities) are insufficient to eliminate any material risk of healthcare workers transmitting COVID-19 in a hospital setting.

141.   Thus, the studies upon which CMS relies in its IFC support Plaintiffs' position that mitigation measures already in place in Ascension facilities, and to which they strictly adhere, are reasonable accommodations which will allow them to continue working with patients without any materially increased risk to patients or the workplace.

142.   If the IFC goes into effect as proposed on January 4, 2022, following the comment period, it will still require compliance with Title VII and other federal anti-discrimination laws, including that "employers following CDC guidelines and

---

[92] *Id.*

the new requirements in this IFC may . . . be required to provide appropriate

accommodations, to the extent required by Federal law, for employees who request

and receive exemption from vaccination because of a . . . sincerely held religious

belief, practice, or observance."[93]

## B.   Ascension's Vaccine Mandate[94]

143.   On July 27, 2021, Ascension's President and CEO, Joe Impicciche, sent

an announcement to all Ascension employees (*i.e.*, "associates"), stating in part:

> Like many health systems across the country, including in many
> of our markets, we are moving to require our associates to be
> vaccinated against COVID-19 . . .
>
> Tens of thousands of Ascension associates have already been
> vaccinated with the available vaccines, as have millions of
> people across the country and the world. But *we must do more to
> overcome this pandemic* as we provide safe environments for
> those we serve.
>
> *Ascension will require that all associates be vaccinated against
> COVID-19, whether or not they provide direct patient care, and
> whether they work in our sites of care or remotely.*
>
> *This includes* associates employed by subsidiaries and partners;
> physicians and advanced practice providers, whether employed
> or independent; and *volunteers and vendors entering Ascension
> facilities.*[95]

(emphasis added).

144.   Mr. Impicciche's motive for imposing a vaccine mandate is that he

believes "there is a moral obligation to make use of the vaccines" and "increasing

---

[93] 86 Fed. Reg. 61,569 (Nov. 5, 2021).
[94] As used in this section, the term "Ascension" refers collectively to Ascension Health, Inc. and Ascension – St. Vincent.
[95] Joe Impicciche (Ascension President and CEO) Letter to Ascension Associates re. COVID-19 Vaccination, (July 27, 2021) (**App. 10**).

the utilization rate of COVID-19 vaccination . . . is a moral imperative." (emphasis added).[96]

145.   Ascension's vaccine mandate is even more encompassing than the IFC. The IFC *will not* apply to those who work remotely.[97] However, Ascension's mandate *does* apply to those working remotely.

146.   Ascension's mandate is absolute in every way—there is no alternative for periodic testing, mask wearing, targeted use of N95 masks, etc., even for employees who have already had COVID-19 and still enjoy immunity from the disease. Employees must choose vaccination or face suspension leading to certain termination.

## C.   Plaintiffs' Sincerely Held Religious Beliefs[98]

147.   The statement of Ascension's President and CEO that there is a moral obligation of everyone to receive a COVID-19 vaccine is directly at odds with the sincerely held religious beliefs of the Plaintiffs.

148.   In their religious accommodation requests Plaintiffs explained their concerns that the COVID-19 vaccines were developed or tested using cell lines derived from aborted babies.

---

[96] Joe Impicciche (Ascension President and CEO) Letter to Employees re: Pope Francis' statement COVID-19 vaccination and "act of love" and moral obligation, (Aug. 19, 2021) **(App. 11)**.

[97] 86 Fed. Reg. 61,570 (Nov. 5, 2021) ("Individuals who provide services 100 percent remotely, such as fully remote telehealth or payroll services, are not subject to the vaccination requirements of this IFC.").

[98] As used in this section, the term "Ascension" refers collectively to Ascension Health, Inc. and Ascension – St. Vincent.

149. There is no dispute from Ascension that each of the COVID-19 vaccines currently available in the United States were developed or tested using cell lines derived from aborted babies. Ascension has in communications to its employees acknowledged the link between the COVID-19 vaccines and cell lines derived from aborted babies.[99]

150. Plaintiffs' beliefs regarding their obligation to treat their bodies as the "temple of the Holy Spirit" and to not participate in practices which could encourage the taking of innocent life are consistent with widely held Christian religious beliefs and shared by each of the Plaintiffs.

151. Ascension has not challenged the sincerity of Plaintiffs' religious beliefs.

152. Such beliefs easily fit within the common understanding of religious beliefs under Title VII which is "that a religious belief is a belief that is considered religious 'in [the] person's own scheme of things' and is 'sincerely held.'" *Adeyeye*, 721 F.3d at 448 (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n. 12 (7th Cir.1978)).

**D.    Ascension's Religious Exemption Process[100]**

153. Ascension has informed all its employees that it offers religious exemptions to its COVID-19 vaccine mandate.

---

[99] *See* Questions and Answers about Ascension's Associate COVID-19 Vaccination Policy at 7 (added August 10, 2021) (**App. 12**) ("How can we mandate a vaccine that utilizes fetal cell lines from historical abortions in its development?").
[100] As used in this section, the term "Ascension" refers collectively to Ascension Health, Inc. and Ascension – St. Vincent.

154.    Ascension's Questions and Answers about Ascension's Associate

COVID-19 Vaccination Policy ("Ascension Vaccination Policy Q&A") provides:

> In those instances when someone may not be able to get the
> COVID-19 vaccine because of a medical condition or strongly
> held religious belief, we will provide a process for requesting an
> exemption. Requests for exemptions will be reviewed by
> members of Associate and Occupational Health, Human
> Resources, and Mission Integration. The exemption application
> will be available the week of August 16. Exemption applications
> are due by October 1 to allow time for review. A decision will be
> made and shared with you by October 12 on the status of the
> exemption request. [101]

155.    Ascension's announcement of a religious exemption process is in line

with EEOC guidance on private employers issuing COVID-19 vaccine mandates.

*See* What You Should Know About COVID-19 and the ADA, the Rehabilitation Act,

and Other EEO Laws §§ K.1 & K.2., EEOC (May 28, 2021),

https://www.eeoc.gov/wysk/what-you-should-know-about-COVID-19-and-ada-

rehabilitation-act-and-other-eeo-laws.

156.    Ascension's written policy is if an employee is not vaccinated by

November 12, 2021, they will be "suspended pending further investigation" and that

"failure to comply will be deemed a voluntary resignation of the associate."[102]

157.    Associates have been told that all decisions regarding exemptions are

being made at Ascension's national level and cannot be changed at the local level.

Ascension managers explained to associates this policy meant that associates

---

[101] Ascension Vaccination Policy Q&A at 8-9 (added July 30, 2021) (**App. 12**) ("When can I
send in an exemption and what is the process?").
[102] Ascension Vaccination Policy Q&A at 11 (added July 28, 2021) (**App. 12**) ("What
happens to an associate who declines to be vaccinated against COVID-19?").

denied a religious exemption who did not submit to COVID-19 vaccination would be

terminated on or about November 12, 2021. For instance, an Ascension practice

manager told Dr. Halczenko that:

> I have been told that *Ascension is the one that is making the decisions on the exemptions* and *once a decision is made it is final*. The local ministry will not be able to challenge/change that decision. The exemption requests are due by Oct 1st and the decisions will be made by Oct 12th. . . I have been told that *Ascension is being very strict on this policy* and *once someone is suspended it will quickly escalate to "voluntary resignation"* (whatever term HR wants to use) but *you will no longer be employed by Ascension*. I know that 11/12 seems like a long time from now and obviously policies etc can change but as of now this is our policy and I do not want to see anyone get *terminated* over this policy.[103]

158. The understanding that Ascension associates who did not get a

COVID-19 vaccine by November 12, 2021, would be terminated on or about that

date was reinforced by Ascension emails *until November 5, 2021*.

159. On November 5, 2021, Ascension, for the first time, communicated to

all associates that, those not approved for exemptions who did not take a COVID-19

vaccine would be *suspended* on November 12, 2021, and then *terminated* on January

4, 2022:

> Ascension's requirement for all associates and medical staff members to receive the COVID-19 vaccine by Nov. 12, 2021, remains in effect. Associates and medical staff members who do not meet this requirement will be suspended. However, in alignment with the Centers for Medicare & Medicaid Services (CMS) timeline, associates will be reinstated if they complete and upload documentation of their fully vaccinated status by

---

[103] 2021/09/14 Email from Nicole Jansen to Dr. Halczenko (**App. 18**) (emphasis added).

Jan. 4, 2022. Failure to meet this requirement will be considered a voluntary resignation.[104]

160.   Ascension set a deadline of October 1, 2021, for requests for exemptions from its vaccine mandate to be submitted. Ascension also set the same October 1 date as the deadline to apply for exemptions to Ascension's Influenza vaccine requirement.

161.   The October 1 submission deadline chosen by Ascension provided only six-weeks to process all requests for exemptions from COVID-19 and Influenza vaccination before the November 12, 2021, deadline for associates to be vaccinated. However, because two of the three vaccines require about a two-week period between injections, this meant that Ascension allotted only about a month to process all religious exemptions across its nationwide network.

162.   Plaintiffs all applied before the October 1 deadline for religious exemptions from the COVID-19 vaccine.

163.   Nurse Gillespie also applied for a religious exemption from the Influenza vaccination requirement. She had received religious exemptions from the Influenza vaccine from Ascension in prior years.[105]

**Ascension's Resign to Apply Ploy**

---

[104] 11/5/2021 email from Nick Ragone, Chief Marketing and Communications Officer (Ascension), Subject: An Important Message Regarding COVID-19 Vaccination, attached to Supplemental Declaration of Kristin Evans (**App. 6**).

[105] Nurse Gillespie received three denials of her Influenza religious exemption requests between early October, 2021 and the end of the month. However, recently she got an email granting her Influenza exemption request on the condition that she continue to comply with Ascension's masking rules.

164.    Ascension forced applicants for an exemption from its COVID-19 vaccine mandate to use a cumbersome online application system that (1) limited the words they could provide when requesting an exemption and (2) made it appear that exemptions from the vaccine mandate were entirely at Ascension's discretion because Ascension associates were told that they were required to either: (a) take the vaccine or (b) "resign" from employment if their exemption request was not approved.

165.    The automated online religious exemption application interface created by Ascension asked applicants to click a drop down stating: "'I Agree' to voluntarily resign if my request is denied and I do not comply." [106]

166.    Through this method Ascension actively sought to require its employees to prejudice or limit their Title VII rights (or to believe that they had waived their Title VII rights, including their right to contest Ascension's exemption decision) merely to be able to request an exemption from Ascension's vaccine mandate.

167.    Ascension's "resign" requirement messaging was thereafter followed up on by Ascension managers who asked exemption applicants when they were going to "resign." [107]

168.    Most recently, on November 5, 2021, Ascension notified its associates that any associates not vaccinated by November 12, 2021, "will be suspended" and

---

[106] *See, e.g.*, Halczenko Aff. ¶ 43 (App. Ex. 1)
[107] Picchiottino Decl. ¶ 51 (**App. 81**).

that failure to be vaccinated by January 4, 2022, "will be considered a voluntary resignation."

169.    Ascension's coercive effort to leverage the exemption process from the outset as a tool to limit its associates' rights and encourage them to (a) believe they had to resign if an exemption was not granted to them, or (b) abandon the exemption process, and (c) had the effect of making some employees believe that the exemption process was entirely at Ascension's discretion, and (d) discouraged Ascension employees from asserting their rights under Title VII.[108]

**Ascension's First Week in October Religious Exemption Denials**

170.    Ascension told associates that exemption applications would be available the week of August 16 and due by October 1.[109]

171.    Plaintiffs submitted their applications for exemption as early as August 18 and as late as September 29. However, regardless of when associates submitted their exemption applications, they all received their denials during October 1-8.[110]

---

[108] Gillespie Aff. ¶¶ 34-35 (**App. 4**) ("I know of some coworkers who told me they considered filling out a religious exemption but chose not to . . . because they did not want to agree to 'voluntarily resign.' Others told me that did not want to receive the vaccine but felt coerced into it as they had no choice to leave their job to lose their income and health insurance.").
[109] Ascension Vaccination Policy Q&A at 8 (added July 30, 2021) (**App. 12**) ("When can I send in an exemption and what is the process?").
[110] Halczenko Aff. ¶¶ 41, 50 (**App. 1**) (Exemption request submitted Sept. 6, denial received Oct. 1); Jimenez Aff. ¶¶ 41, 50 (**App. 2**) (Exemption request submitted Sept. 21, denial received Oct. 7); Gillespie Aff. ¶¶ 35, 40-41 (**App. 4**) (Exemption request submitted Sept. 29, denial received Oct. 6); Evans Aff. ¶¶ 36, 40 (**App. 5**) (Exemption request submitted Aug. 18, denial received Oct. 7); Fralic Aff. ¶¶ 31, 37 (**App. 7**) (Exemption request submitted Sept. 24, denial received Oct. 6); Brezillac Aff. ¶¶ 32, 36 (**App. 77**) (Exemption request submitted late Sept., denial received Oct. 8); Picchiottino Aff. ¶¶ 32, 36 (**App. 81**)(Exemption request submitted Sept. 2, denial received Oct. 7).

172.    Although Ascension's religious exemption processors had Kristin Evans' religious exemption application for fifty (50) days, Sandy Picchiottino's application for thirty-five (35) days, and Dr. Halczenko's application for twenty-five (25) days, these associates, and all the other associates received the same single sentence justification for denial of their applications.

173.    No associate was contacted by Ascension's exemption processors to ask any questions about accommodations or to discuss their application in any way.

174.    It is apparent that Ascension outsourced its religious exemption processing.

175.    Every exemption denial came from the same generic and anonymous email address: ascensionprod@service-now.com.

176.    No local input was permitted into Ascension's religious exemption review process.

177.    Ascension's local management at St. Vincent in Indianapolis remarked to Dr. Halczenko that "Ascension is the one that is making the decisions on exemptions" and that the local hospital "will not be able to challenge/change that decision."[111]

178.    The same Ascension Practice Manager told Jennifer Jimenez, "I know that Ascension is being very very stringent on any exemptions. I have not heard of any being approved."[112]

---

[111] Halczenko Aff. ¶ 35 (**App. 1**); Sept. 14, 2021, email from Nicole Jansen to Dr. Halczenko (**App. 18**).
[112] Oct. 8, 2021, email from Nicole Jansen to Jennifer Jimenez (**App. 25**) at 2.

179.    Ascension's "very very stringent" and confusing exemption process created a sense of the inevitability of denials that put pressure on associates who had sought religious exemptions to capitulate and receive the vaccine.

180.    By waiting until the first week in October or later to deliver denials Ascension put additional pressure on associates to capitulate and reduced the opportunity for associates to interact with Ascension as by the time denials were received only about three weeks remained before an associate would need to be vaccinated to comply with Ascension's November 12 deadline.

181.    Ascension's convoluted exemption process discouraged some associates from even applying for a religious exemption. [113]

182.    Plaintiffs are aware of co-workers with religious objections to taking the vaccine who gave in to Ascension's demands and took the vaccine soon after the denial of their application.[114]

183.    Ascension's failure to fully assess or scrutinize initial religious exemption requests as required by Title VII and to instead deny initial exemption requests with little or no scrutiny, put applicants for religious exemption at immediate risk of termination and ratcheted up the pressure on those whose religious accommodation requests had been perfunctorily denied.

### Ascension's Refusal to Engage in an Interactive Process with Those Requesting Accommodation

---

[113] Halczenko Aff. ¶ 46 (**App. 1**); Gillespie Aff. ¶¶ 33-35 (**App. 3**)
[114] *Id.*

184.   At no time did Ascension engage any Plaintiff in a give and take discussion about potential accommodations. Although several Plaintiffs tried to engage Ascension in dialogue, they were ignored and no face-to-face or verbal meetings on religious exemption accommodations took place with any Plaintiff. Due to Ascension's disinterest in communicating with any Plaintiff about their request for religious exemption there was:

a.   No discussion about what mitigation measures any Plaintiff used to prevent COVID-19 transmission,

b.   No discussion about what mitigation measures any Plaintiff would be willing to use to prevent COVID-19 transmission,

c.   No discussion about the level of mitigation measures employed by Ascension personnel in Plaintiff's unit and hospital in order to prevent COVID-19 transmission,

d.   No discussion about statistical data relating to transmission rates in Plaintiffs unit or hospital,

e.   No discussion about what parts of Ascension facilities any Plaintiff might be willing to avoid (such as breakrooms, lounges, cafeterias, waiting rooms, etc.) as an accommodation,

f.   No discussion about the frequency of COVID-19 testing any Plaintiff might agree to as an accommodation,

g.   No discussion about any prior exposure of Plaintiff to the SARS-Co-V-2 virus,

h.   No discussion about antibody levels and other indicia of immunity to the SARS-Co-V-2 virus that the Plaintiff might have,

i.   No discussion about the Plaintiff's reliability and why they could be depended upon to rigorously employ mitigation measures,

j.     No discussion about the current level of community spread of the SARS-Co-V-2 virus,

k.     No discussion about the vaccination rate in Plaintiff's unit,

l.     No discussion about the vaccination rate in Plaintiff's hospital,

m.     No discussion about the vaccination rate among Ascension's patients at Plaintiff's healthcare facility,

n.     No discussion about the number of individuals with medical exemptions who are caring for patients in Plaintiff's unit, in Plaintiff's hospital and within the Ascension system, and

o.     No discussion about the lack of SARS-Co-V-2 virus transmissions within Plaintiff's unit.

185.   As a result, no Plaintiff has reason to believe any of the foregoing topics or any other relevant factor was ever considered by Ascension in relation to any Plaintiff's religious exemption request, and Plaintiffs reasonably believe that no such factors were considered by Ascension.

**Ascension's "Out of the Blue" 7-Day Appeal Deadline**

186.   All applicants for religious exemptions received a perfunctory, boilerplate email stating that their request for exemption had been denied, but this email confusingly stated that, although their request for exemption was denied, the associate had seven-days to submit additional information to Ascension.

187.   Nothing about Ascension's prior written instructions to its associates alerted them that those applying for exemptions would have an appeal opportunity, or that they could submit documents and information to Ascension outside the

51

online submission process, or that an appeal process would give them 7-days to submit documents after denial of an application for exemption.

188.   Notification to associates about the 7-day appeal period came "out of the blue" and was only contained in the email Ascension sent denying their request for religious exemption.[115] It was not, for instance, referenced in Ascension's Q&A document. In fact, from August onward the Q&A document told associates, "there will not be an appeal process."[116]

189.   As a result, some Plaintiffs did not even become aware that they had received an email giving them only 7-days to appeal until several days into the short period.

190.   The short deadline put further pressure on associates seeking religious exemptions.

191.   The notice that documentation could be submitted to Ascension was confusing because it followed a written denial of the associate's application for exemption.

192.   The notice did not explain why an associate should submit documentation given the associate's exemption request had already been denied.

193.   Moreover, Ascension's perplexing communication did not explain what information Ascension might be looking for, or even how to submit the documentation.

---

[115] *See* Halczenko Aff. ¶ 50, (App. 1); October 6, 2021, email from ascensionprod@service-now.com to Erin Gillespie (App. 31).
[116] Ascension Vaccination Policy Q&A at 5 (added August 16, 2021) (**App. 12**) ("If a request for exemption is denied is there an appeal process?").

194.    The "out of nowhere" appeal and document submission process was another confusing aspect of the exemption process for associates and appears to have been intended to be that way, as it is difficult to believe that a corporation as large as Ascension going through a vaccine mandate rollout that had been ongoing for months – and supported by an outside work flow processing company – did not carefully think through the religious exemption process it would put applicants through.

195.    Ascension surely could have invited the submission of documentation supporting an applicant's exemption request at the outset of the process before Ascension had issued a denial of an associate's exemption request had it wanted to.

196.    Yet, Ascension chose instead to take requesters through a process that severely limited the word count of their initial request and did not initially provide a process for submitting documents, then only advised requesters of an opportunity to submit documentation after the requester's application had been denied.

197.    These confounding aspects of Ascension's exemption process had at least two impacts: (a) they limited the number of religious exemption requesters who would submit documentation to only the most patient and persistent, and (b) they put additional time pressure on all applicants for exemptions, giving them a short deadline that they had no opportunity to plan for, and it perhaps induced some to abandon their request for exemption.

**Ascension's Run Out the Clock Strategy**

198.   Ascension's chaotic exemption process was either an utter disaster of organization, coupled with a callous refusal to reasonably communicate with associates seeking religious exemptions, or a calculated effort to game associates into not pursuing their legal rights.

199.   The unexpected out of the blue appeal process initially provided the Plaintiffs false hope that they might still convince Ascension of the merits of their claims.

200.   Three of the Plaintiffs sent lengthy letters to Ascension's Human Resources Director detailing many of the concerns raised in this Complaint, hoping to alert Ascension's senior management into the inadequate way in which the religious exemption process was being handled.[117]

201.   However, Ascension's Human Resources Director did not respond to any Plaintiff or even acknowledge receipt of their letters.[118]

202.   Some associates would eventually receive up to four separate denials of their religious exemption applications, creating uncertainty as to when a denial had finally been given by Ascension.[119]

203.   Other associates got follow up emails stating that their exemption applications which had originally been denied were still under consideration.

---

[117] *See* Halczenko Aff. ¶¶ 59-61 (**App. 1**); Jimenez Aff. ¶¶ 45-46 (**App. 2**); Gillespie Aff. ¶¶ 43-44 (**App. 4**).
[118] *Id.*
[119] Gillespie Aff. ¶¶ 37-46 (**App. 4**); Gillespie Supplemental Decl. (attached Oct. 6, 2021 email) (**App. 4**).

204.    In one case, Nurse Practitioner Jimenez waited over three weeks after getting a notice that her exemption application was again under review.[120]

205.    Ms. Jimenez was quite hopeful that her lengthy October 13, 2021 letter sent to Ascension's Director of Human Resources might bear fruit, particularly as she had gotten blood test results that demonstrated her Covid-19 antibody level from a prior infection was more than two times higher than the average antibody level for a recipient of a second dose of an mRNA vaccine.[121]

206.    Yet, after getting an email on October 14, stating her application was under review Ms. Jimenez heard nothing for two weeks.

207.    After two weeks she sent a polite email asking the status of her application which was never responded to by Ascension.[122]

208.    Instead, at 6:50 p.m. on Friday, November 5, 2021, one week to the day before Ms. Jimenez was required to be vaccinated or be suspended (and too late in fact to be fully vaccinated using a two-dose vaccine had she chosen to do so), Ms. Jimenez finally got two anonymous emails from **Service Desk** <ascensionprod@service-now.com stating her exemption request had been denied.[123]

209.    Thus, the process Ascension chose to employ to process religious exemption requests ran many associates to the brink of suspension until just about a week before the November 12 deadline they all received virtually identical boilerplate emails confirming their exemption requests had been denied.

---

[120] Jimenez Aff. ¶¶ 42–49 (**App. 2**).
[121] *Id*. at ¶ 62.
[122] *Id*. at ¶ 49.
[123] Jimenez Supplemental Decl. **App. 3**

**Ascension's Latest Actions: November 5, 2021, Associate Suspension and "Voluntary Resignation" Maneuver and Last-Minute "Individualized Assessment" Emails**

210.   On November 5, 2021, after CMS issued its IFC Rule earlier in the day, Ascension sent an email informing associates that any associate who was unvaccinated by November 12 "will be suspended" and if they were not fully vaccinated by January 4, 2022, it would "be considered a voluntary resignation."[124]

211.   This maneuver imposes additional hardship upon religious exemption requesters by imposing a two-month suspension without pay merely because they requested a religious exemption. It also extends by an additional two months the covenant not to compete of any suspended associate with a covenant not to compete. By imposing a suspension and then describing an associate's termination inaccurately as a "voluntary resignation," these characterizations may make it difficult for those who sought religious exemptions to obtain unemployment compensation.

212.   Ascension's last-minute creation of a 2-month mandatory suspension purgatory for applicants for religious exemption underscores the arbitrariness of Ascension's original November 12, 2021, deadline for receiving the vaccine.

213.   Also, between November 4-6, 2021, after they had already been notified that their exemption requests had been denied, Plaintiffs received another unprompted, out of the blue, email.

---

[124] 11/5/2021 email from Nick Ragone, Chief Marketing and Communications Officer (Ascension), Subject: An Important Message Regarding COVID-19 Vaccination, attached to Supplemental Declaration of Kristin Evans (**App. 6**).

214.   This email repeated that the Plaintiff had been denied an exemption and then stated that the associate had been denied based on an "individualized assessment," without saying anything about what the alleged assessment entailed.[125]

215.   Ironically, the numerous "individualized assessment" emails sent out by Ascension were not individualized in any way. They were simply mechanized, mass-produced emails evidently sent merely to insert into the chain of emails received by each associate the magic words, "individualized assessment."

216.   Despite what the email claimed, however, Plaintiffs did not receive any truly individualized communication from Ascension in relation to their religious exemption requests addressing the individual circumstances of any Plaintiff.[126]

## CLASS ALLEGATIONS

217.   Plaintiffs bring this class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

218.   Through this action, Plaintiffs seek to represent a class of all current or past Ascension employees who have requested or will request religious exemption or accommodation from Ascension's COVID-19 vaccine mandate and have:

(1) had or will have those accommodation requests either formally or effectively denied and are thus faced with the decision of either taking a

---

[125] *See, e.g.*, 11/6/2021 Email from ascensionprod@service-now.com to Erin Gillespie, attached to Gillespie Supp. Decl. (**App. 4**); 11/5/2021 Email from ascensionprod@service-now.com to Jennifer Jimenez attached to Jimenez Supp. Decl. (**App. 3**).
[126] *See, e.g.*, Halczenko Aff. ¶ 55 (**App. 1**) ("I made additional inquiries seeking a dialogue with Ascension about accommodating my exemption request. However, no one from Ascension corporate offices discussed the matter with me.").

vaccine to which they object, or suffering termination, including the

functional equivalent of termination: suspension without pay, or

(2) been discharged as a consequence of not taking a COVID-19

vaccine, or

(3) resigned or left employment at Ascension after announcement of

Ascension's COVID-19 mandate.

219.    Plaintiffs anticipate that they will ultimately seek two subclasses

when they move for class certification:

(1) employees who have sought a religious accommodation and

previously recovered from COVID-19, possess antibodies against COVID-19,

and are willing to produce periodic proof to Ascension showing that they

remain antibody positive and are willing to submit to all current mitigation

measures and reasonable additional measures such as periodic COVID-19

testing; and

(2) employees who sought religious accommodations, have not

previously contracted COVID-19, and are willing to submit to all current

mitigation measures and reasonable additional measures such as periodic

COVID-19 testing. There may also be separate subclasses for employees who

are "patient facing" and those who are "non-patient facing."

220.    The class is so numerous that joinder of all members is impractical.

While the exact class size is unknown to Plaintiffs at this time, it is expected to

exceed 2,500 employees. The precise number and identification of the class

members will be ascertainable from Ascension's records during discovery.

221.    There are questions of law and fact common to all members of the

class. Those common questions include, but are not limited to, the following:

a. Did Ascension provide its employees with an adequate mechanism for requesting an accommodation when it required requests to be submitted through an online system which limited the amount of information that could be provided in support of an exemption request and by an arbitrary date?

b. Did Ascension comply with its obligations under federal law to engage in the interactive process when responding to each accommodation request?

c. Did Ascension comply with its obligations under federal law when it sought to require associates to agree to resign if their religious exemption request was denied by Ascension?

d. Did Ascension comply with its obligations under federal law when it issued accelerated denials of applicants for religious exemptions and then offered them an arbitrary seven (7) day appeal period in which to submit additional evidence to Ascension?

e. Did Ascension comply with its obligations under federal law through providing its employees a confusing and chaotic process for seeking religious exemptions?

f.  Was the uniform and perfunctory one-sentence justification that Ascension gave all employees for denying their religious exemption requests pretextual?

g. Was the uniform and perfunctory one-sentence justification that Ascension gave all employees for denying their religious exemption requests sufficient to establish undue hardship?

h. Did Ascension comply with its obligations under federal law to reasonably accommodate employees with religious objections to the vaccine mandate and to not discriminate when it offered no accommodations and denied

religious exemption requests on the basis of alleged increased risk while granting medical exemption requests?

i.  Did Ascension intentionally pursue a strategy to terminate as many associates as possible who sought a religious exemption to taking a COVID-19 vaccine?

j.  Was the statement of Ascension's President and CEO, made to all Ascension associates, that receiving COVID-19 vaccination was a "moral obligation" and that increasing the number of persons vaccinated was a "moral imperative" a motive for Ascension's denial of religious exemptions?

k.  Did Ascension engage in religious discrimination when it told all Ascension employees that they were morally required to be vaccinated and then denied a high percentage of religious exemption requests to Ascension's vaccine mandate?

l.  Did Ascension retaliate against employees who engaged in protected activity when it initially responded to all or most exemption requests by denying the request and then engaging in a common pattern of conduct designed to discourage or dissuade employees from requesting (or continuing to seek) an accommodation?

**m.** Did Ascension retaliate against employees who engaged in protected activity when it purposefully and perfunctorily denied requests for religious exemption without fully examining them?

**n.** Did Ascension fail to reasonably accommodate the religious exemption requests of employees who had previously recovered from the SARS-CoV-2 virus when Ascension failed to consider immunity gained from prior infection in evaluating religious exemption requests?

222.  Plaintiffs' claims are typical of the claims of the class because they, like the class members, requested accommodations from Ascension's vaccine mandate and Ascension formally or effectively denied those requests without engaging in the interactive process.

223.    For the same reason, Plaintiffs will fairly and adequately protect the interests of the class.

224.    The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims. Joinder of all members is impracticable.

## COUNT I

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.* ### Religious discrimination—retaliation

### On behalf of Plaintiffs Dr Halczenko, Nurse Practitioner Jimenez, Nurse Gillespie, Nurse Fralic and Nurse Evans, and others similarly situated

225.    Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

226.    Title VII prohibits Ascension from retaliating against an employee for engaging in protected activity. *See Boston v. U.S. Steel Corp.,* 816 F.3d 455, 464-65 (7th Cir. 2016).

227.    Plaintiffs engaged in protected activity when they requested (or sought to request) religious accommodations from Ascension's vaccine mandate.

228.    Attempting to leverage access to the religious application process itself to require Ascension employees to sign away their Title VII rights and "voluntarily resign" if Ascension denied their application is itself retaliatory and an attempt to limit the Title VII rights of those requesting religious accommodation.

229.   Ascension's "voluntarily resign" ploy is further evidence of the lack of good faith inherent in Ascension's handling of its vaccine mandate exemption process.

230.   The lack of face-to-face or telephonic communication with requesters about the circumstances in which they work or other relevant matters raises an inference that little or no inquiry or individualized evaluation was given to the requests.

231.   Ascension's pattern and practice of sitting on associates' exemption requests for lengthy periods ranging up to 50 days and then responding with the same perfunctory, pro forma, denials that everyone else received also supports the conclusion that no individualized inquiry was undertaken as to any religious exemptions.

232.   Further, springing an arbitrary additional seven-day period to submit additional information to Ascension after the associate's initial request for exemption had already been denied suggests that Ascension did not operate the religious exemption process in good faith.

233.   These actions did, and were intended to, coerce Plaintiffs and other employees to either forgo their religious beliefs and receive the COVID-19 vaccine or abandon or not fully document their applications for religious exemption.

234.   Ascension's cumbersome, chaotic, and confusing religious exemption process constituted retaliation towards associates seeking religious exemptions.

235.    Ascension's discriminatory treatment of religious accommodation requests—arbitrarily cutting off the deadline for submitting religious accommodations while at the same time granting requests for medical accommodation—supports an inference that Ascension planned to not grant religious accommodation requests and that the religious exemption process was a charade.

236.    Further, Ascension's false characterization of Plaintiffs as being "suspended" is coercive, prejudicial to Plaintiffs, and in retaliation for Plaintiffs seeking a religious exemption.

237.    Likewise, Ascension's false characterization of Plaintiffs as voluntarily resigning effective January 4, 2022, is prejudicial and in retaliation for Plaintiffs seeking a religious exemption.

238.    Further, Ascension's emails sent to Plaintiffs during November 4-6, 2021, claiming that "individualized assessment[s]" of their circumstances had occurred were false and were intended to mislead Plaintiffs and dissuade them and others similarly situated from pursuing their rights under Title VII.

239.    Plaintiffs' religious beliefs and their protected activity of seeking a religious exemption were the causes of Ascension's adverse employment actions.

240.    By retaliating against Plaintiffs for engaging in protected activity, *i.e.*, filing requests for religious exemption and seeking accommodation, Ascension has violated Title VII. This violation has harmed and continues to harm Plaintiffs.

241.    Plaintiffs have filed charges with the EEOC complaining of these retaliatory and unlawful actions on a class wide basis.

242.    Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT II

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination-direct and indirect methods

### On behalf of Plaintiffs Dr. Halczenko, Nurse Practitioner Jimenez, Nurse Gillespie, Nurse Fralic and Nurse Evans, and others similarly situated

243.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

244.   Pursuant to 42 U.S.C.A. § 2000e-2(a)(1) it is "an unlawful employment practice for an employer. . . to discharge any individual . . . because of such individual's . . . religion[.]"

245.   The Supreme Court has observed that this "intentional discrimination provision prohibits certain motives, regardless of the state of the actor's knowledge," *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015), and that "Title VII does not demand mere neutrality with regard to religious practices [of employees]—that they be treated no worse than other practices. Rather, it gives them favored treatment[.]" *Id.* at 775.

246.   "Title VII has been interpreted to protect against requirements of religious conformity and as such protects those who refuse to hold, as well as those who hold, specific religious beliefs." *Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 391 (E.D.N.Y. 2016) (citation omitted).

247.   Therefore, Title VII will support a claim for "reverse religious discrimination: that defendants subjected claimants to discrimination by imposing religious practices and beliefs on claimants." *Id.*

65

248.    "Title VII . . . protects employees from discrimination because they do not share their employer's religious beliefs." *Id.* at 392.

249.    Thus, for example, "[a]n employer discriminating against any non-Catholic violates the anti-discrimination laws no less than an employer discriminating only against one discrete group[.]" *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 378 (2d Cir. 2003).

250.    In connection with Ascension's vaccination mandate, Ascension's President and CEO stated in official communications to all Ascension associates that it is a "Catholic . . . moral imperative" to "increase[e] the utilization rate of COVID-19 vaccination"[127] and that Ascension's vaccine mandate furthers this goal.

251.    Ascension's effort to impose an allegedly "Catholic . . . moral imperative" upon employees and require them to set aside their personal religious beliefs on pain and penalty of losing employment is overtly discriminatory.

252.    Title VII prohibits Ascension from requiring its employees conform to a religious belief that COVID-19 vaccination is a "moral imperative."

253.    Ascension's inhospitable view of the religious beliefs of employees who find taking the COVID-19 vaccines to be morally objectionable and contrary to their religious practices supports an inference that Plaintiffs were discriminated against based on their refusal, on religious grounds, to receive a COVIS-19 vaccine and due to their applying for religious exemption.

---

[127] Joe Impicciche (Ascension President and CEO) Letter to Associates re: Pope Francis' statement COVID-19 vaccination and "act of love" and moral obligation, (Aug. 19, 2021) (**App. 11**).

254.    Additional evidence of Ascension's discrimination and animus towards those unwilling to receive a COVID-19 vaccine due to sincerely held religious beliefs is Ascension's handling of religious exemption requests in comparison to its treatment of exemption requests based on secular reasons.

255.    Ascension's discriminatory treatment in the handling of religious exemption requests vis-à-vis medical exemption requests, *i.e.*, favoring medical exemptions while disfavoring religious exemptions, presents a classic case of reverse discrimination. *See, e.g., Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519, at *5 (6th Cir. Oct. 7, 2021) (discrimination in the handling of COVID-19 vaccination requirements for student-athletes vs. no vaccination requirement for non-athletes).

256.    Reliance on a pretextual or insufficient reason for its adverse employment decisions raises an inference of discrimination.

257.    Further evidence of Ascension's bias and discrimination against Plaintiffs is the perfunctory and plainly pretextual reason given every applicant denied a religious exemption.

258.    The totality of the circumstances related to Ascension's cumbersome, chaotic, and confusing religious exemption process also supports an inference of religious discrimination.

259.    It is now clear that the reason given by Ascension for not providing accommodation (i.e., "increased risk") was pretextual as Ascension did not consider individualized information about Plaintiffs relevant to risk.

260.   To try to cover up Ascension's failure to individually assess the circumstances of religious exemption applicants, on or about November 4-6, 2021, weeks after most requesters had already received notification their request for religious exemption had been denied, representatives of Ascension sent Plaintiffs, and many others similarly situated, identical, robotic, boilerplate, emails from a centralized email address, ascensionprod@service-now.com, stating that an "individualized assessment" of the circumstances surrounding each associate's religious exemption request had been undertaken.

261.   However, making a claim of "individualized assessment" in mass produced emails sent to scores of religious exemption applicants from an anonymous email address does not make it so.

262.   These last-minute emails are in fact an admission by Ascension that an individualized assessment *should have been* conducted, and indeed was required by Title VII to have been conducted, but was not.

263.   These emails further demonstrate that knowing that Ascension had not fulfilled its legal obligations to Plaintiffs and others similarly situated, Ascension representatives sought to cover up Ascension's serial failures to comply with Title VII.

264.   It is reasonable to infer from the totality of the circumstances that Ascension did not bother engaging in an interactive process with those seeking religious exemption because Ascension intended to discriminate against those

seeking religious exemptions and never intended to provide them with a reasonable accommodation.

265.   By discriminating against Plaintiffs because of their sincerely held religious beliefs and their decisions to apply for religious exemptions Ascension violated Title VII, and this violation has harmed and continues to harm Plaintiffs.

266.   Plaintiffs have filed charges with the EEOC complaining of these unlawful actions on a class wide basis.

267.   Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## COUNT III

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

### Religious discrimination—failure to accommodate

### On behalf of Plaintiffs Dr. Halczenko, Nurse Practitioner Jimenez, Nurse Gillespie, Nurse Fralic and Nurse Evans, and others similarly situated

268.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

269.   Title VII prohibits Ascension from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

270.   "The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

69

271.   *The employer must carry the burden of proving undue hardship.* 42

U.S.C. § 2000e(j); EEOC Religious Accommodation Regulation, 29 C.F.R. § 1605.2(b)

and (c)(1).

272.   Ascension has provided a one-sentence justification for its denial of

Plaintiffs' requests for religious exemptions:

> "Due to the nature of your role, approving this accommodation
> poses undue hardship to the organization due to increased risk
> to the workplace and patient safety."

(Emphasis added).

273.   Ascension's perfunctory explanation is vague and prevents or

dissuades applicants from proposing potential accommodations. For instance, the

phrase "this accommodation" is not specific and does not identify the

accommodation(s) that Ascension is stating would impose an undue hardship.

274.   As there was no dialogue with any Plaintiff, the explanation given by

Ascension is not meaningful. Because there was no dialogue there was no discussion

of accommodations. Therefore, a Plaintiff could not know to which accommodation

Ascension was referring.

275.   Also, Ascension's statement that there is a hardship "to the

organization due to increased risk to the workplace and patient safety" is vague,

conclusory, and of no explanatory value. Ascension does not explain, and has never

explained to any Plaintiff, how a risk to workplace and patient safety is increased

by the associate not receiving a COVID-19 vaccine, particularly considering the

many protections against COVID-19 transmission already in place in Ascension facilities.

276.     Throughout the religious exemption process Ascension never provided a cogent explanation of its position, and never communicated relevant facts and reasoning upon which it relies, so that Plaintiffs could assess Ascension's one-sentence justification and meaningfully respond to it.

277.     The undue hardship analysis requires an employer to engage in an individualized assessment of each employee's circumstances. This is clear from the statutory language requiring the employer to demonstrate inability to "reasonably accommodate *an employee's* . . . religious observance or practice without undue hardship." 42 U.S.C. § 2000e(j) (emphasis added). The reference to "*an employee's*" makes clear that the undue hardship analysis is to be unique to the employee and to that employee's circumstances.

278.      "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." *EEOC Religious Accommodation Regulation*, 29 C.F.R. § 1605.2(c) (1).

279.     Thus, while it may have been expedient for Ascension to provide the same single-sentence justification to every religious exemption requester in the country, under Title VII it was not permissible for Ascension to do that alone and meet the requirements of the statute.

280.   As explained above, Ascension is aware of its duty to conduct individualized assessments and sought to cover-up its failure to do so with last-minute, boilerplate emails to all religious exemption applicants.

281.   Each Plaintiff had unique circumstances relevant to the undue hardship analysis that should have been undertaken to address their situation. Yet, they were all treated with the same one-size fits all approach. Thus, this aspect of Ascension's Title VII approach was insufficient as well.

282.   For example, although the five named Plaintiffs all work in Indianapolis, they work in three different hospitals, and within several different care units within those hospitals. Each Plaintiff had different job functions. Further, the hospitals have differing patient bases (for instance a children's hospital deals with different clientele than an adult trauma center), and they provide different services and deliver different kinds of care in comparison to the other Ascension – St. Vincent hospitals. Also, each Plaintiff had differing COVID-19 antibody levels, including some equivalent to or higher than the levels of vaccinated individuals. Each of these factors and others impact assessment of risk levels. Yet, Plaintiffs all received the same, identical, one-sentence justification that was provided to Ascension associates in Indiana, Oklahoma, Wisconsin, Michigan and elsewhere throughout the country.

283.   There is nothing which suggests to Plaintiffs that the statutorily required individualized assessment of undue hardship was undertaken by Ascension, let alone that any assessment of their circumstances was accurate.

Further, Ascension's the failure to engage in an interactive process and conduct individualized assessments demonstrates that the statutory process for determining undue hardship was not followed by Ascension.

284.     The foregoing demonstrates that Ascension's approach was *procedurally* flawed. However, the content of Ascension's repetitive one-sentence justification given to each Plaintiff and many other Ascension associates confirms that it was *substantively* flawed as well.

285.     "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," Smith v. Pyro Min. Co., 827 F.2d 1081, 1085–86 (6th Cir. 1987), and the lack of substantive content in Ascension's one-sentence justification (and indeed in every communication Ascension sent Plaintiffs) demonstrates that Ascension has not established undue hardship.

286.     Merely, stating that there is increased risk to the workplace and patient safety without explaining why and without providing evidentiary support cannot be sufficient to meet Ascension's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations, and Ascension's robotic, one-sentence justification used throughout the country and in myriad contexts demonstrates that Ascension did not do the work of assessing undue hardship.

287.     Undue hardship analysis must start with an analysis of proposed accommodations. As explained above, Ascension did not identify potential

accommodations. Therefore, Ascension did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt an accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

288.    An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-2 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv. Inc.*, 373 F. Supp. 937, 944 (M.D. Ala. 1974). Ascension's one-sentence justification demonstrates that it did not consider potential accommodations.

289.    However, it is clear Ascension could have considered accommodations beyond even those mitigation measures that are already in place in Ascension facilities, and there are reasonable accommodations Ascension could have implemented to accommodate Plaintiffs.

290.    In May 2021, the EEOC issued guidelines addressing the COVID-19 vaccines and rights and obligations of employers, titled "*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws – Technical Assistance Questions and Answers*" (hereafter "*EEOC COVID-19 Guidance*"). The *EEOC COVID-19 Guidance* provides "examples of reasonable

accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially *not* imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift,

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*EEOC COVID-19 Guidance*, K.2.

291.    For some 20 months Ascension has had the opportunity to test many relevant accommodations in the hospitals in which Plaintiffs are employed, including daily assessments of personal health and potential exposure, availability of targeted COVID-19 testing, protocols requiring non-work when symptomatic or potentially exposed to COVID-19, contact tracing, handwashing and hygiene, use of PPE, including masking (such as N-95 masks in appropriate circumstances), face shields, gowns, and disposable gloves as required under the circumstances.

292.    Such accommodations are understood to have prevented *any* substantial or material transmission of COVID-19, whether to patients or from employee to employee within St. Vincent, PMCH and SVWH hospitals.

293.     In addition, there are other accommodations that are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The *EEOC COVID-19 Guidance* states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

294.     Before summarily rejecting Plaintiffs' requests for religious exemptions Ascension was required to *analyze* the potential available accommodations in a real-world context. Had it done so, it would have found accommodations that would eliminate undue hardship. Therefore, Ascension's assertion that undue hardship exists justifying denial of Plaintiffs' religious exemption requests is in error.

295.     Plaintiffs have filed charges with the EEOC complaining of these discriminatory and unlawful actions on a class wide basis.

296.     Wherefore, Plaintiffs request that the Court grant them the relief requested in their prayer for relief below.

## REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

297.     Plaintiffs request this Court exercise its equity jurisdiction to grant a temporary restraining order and preliminary injunctive relief to preserve the *status quo* pending completion of the EEOC's administrative process. *See* Plaintiffs' Brief in Support of Their Motion for TRO and Preliminary Injunction.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff requests that the Court grant the following

relief:

1.     Certify this action as a class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure;

2.     Certify at least two subclasses: (1) employees who have sought a religious accommodation and previously recovered from COVID-19 and possess antibodies against COVID-19; and (2) employees who sought religious accommodations and lack COVID-19 antibodies;

3.     Declare that Ascension has violated Title VII by failing to properly assess whether the requested accommodations to its COVID-19 vaccine mandate sought by Plaintiffs satisfy the "undue burden" threshold;

4.     Declare that Ascension has violated Title VII by discriminating against its employees who have sought religious exemptions to the vaccine mandate by failing to provide reasonable accommodations to its COVID-19 vaccine mandate;

5.     Declare that Ascension has violated Title VII by retaliating against employees who engaged in protected activity;

6.     Issue a temporary restraining order and/or preliminary injunction followed by a permanent injunction, enjoining Ascension from terminating any employee who has a religious basis for seeking an exemption or accommodation, and enjoining Ascension from denying as untimely any request for a religious exemption or accommodation. The Court should enjoin such actions until Ascension has completed the interactive process for all employees who request such an accommodation and granted reasonable accommodations as required by federal law—which could include: (i) for those who test positive for antibodies against COVID-19, allowing them to be accommodated through regular antibody testing, mask wearing and use of other reasonable mitigation measures, including submitting to periodic COVID-19 testing; and (ii) for those otherwise

qualifying for religious accommodations, allowing them to attend work wearing a mask while around others and use of other reasonable mitigation measures, including submitting to periodic COVID-19 testing.

7. Award Plaintiffs, and those similarly situated, damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

8. Award Plaintiffs reasonable attorneys' fees and costs; and

9. Grant any other relief that the Court deems just, proper, and equitable.

10. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

Dated: November 8, 2021

Respectfully Submitted,

**KROGER, GARDIS & REGAS, LLP**

/s/ William Bock, III
William Bock, III, Atty. No. 14777-49
Adam R. Doerr, Atty. No. 31949-53

ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000